**SOUTHERN CROSS STEAMSHIP CO., Inc., Appellant,**

v.

**Georgios FIRIPIS, Appellee.**

**No. 8099.**

United States Court of Appeals Fourth Circuit.

Argued Sept. 27, 1960.

Decided Dec. 28, 1960.

Walter B. Martin, Jr., Norfolk, Va. (Vandeventer, Black, Meredith & Martin, Norfolk, Va., on the brief), for appellant.

Sidney H. Kelsey, Norfolk, Va., for appellee.

Before SOBELOFF, Chief Judge, and SOPER and HAYNSWORTH, Circuit Judges.

SOBELOFF, Chief Judge.

Important questions concerning the applicability of the Jones Act, 46 U.S. C.A. § 688, and liability for double wages under 46 U.S.C.A. § 596, are presented in this appeal by a shipowner from a decree in favor of a seaman for earned wages, double wages, maintenance, and damages for personal injuries resulting from negligence.

George Firipis, an able bodied seaman, was injured on April 1, 1958, while on board the Steamship Margaritis which was then in drydock in Norfolk, Virginia. In April, 1957, Firipis had signed an employment contract in Greece to serve upon the Margaritis for one year and joined the vessel in Alexandria, Egypt. On March 13, 1958, the ship left Bremen, Germany, bound for the United States and arrived in Norfolk on April 1, when it immediately went into drydock. Later that day, Firipis was assisting in moving an oxygen cylinder when he fell and injured his hand. He testified, and the District Court so found, that he slipped on oil on the deck. He was then discharged from the ship and taken immediately to the United States Public Health Service Hospital at Norfolk, where he remained until May 15, 1958.

The day after his injury, on April 2, 1958, he was paid his wages for the period from March 13, 1958, to April 1, 1958, and signed a receipt for these.

On April 14, 1958, Firipis filed a libel against the ship and against her owner, Southern Cross Steamship Company, Inc., in the United States District Court for the Eastern District of Virginia, claiming damages for personal injuries under the Jones Act, maintenance, wages and double wages for waiting time.

On February 8, 1960, the District Court rendered judgment in favor of the libellant, Firipis, 181 F.Supp. 48. The court held that the Jones Act was applicable and that under the circumstances of the case, the presence of oil constituted negligence, entitling the libellant to $3500 damages diminished by fifteen per cent for contributory negligence. The court also found that wages were not paid for a period of time prior to March 13, 1958, and awarded Firipis such wages plus the statutory double wages for non-payment without sufficient cause. Additionally, the court granted Firipis $754.79 for unpaid maintenance. On this appeal, the shipowner contests everything except the award for maintenance.

I.  Applicability of the Jones Act.

The Margaritis, an American built liberty ship, flew the flag of the Republic of Honduras and the articles executed by the libellant were Hondurian, stating that in the case of accident, Hondurian law should be applied. The shipowner insists that the law of the flag, which was proven below,[1] should control, and therefore the District Court committed error in holding the Jones Act applicable.

The leading case dealing with the applicability of the Jones Act where there are contacts with more than one nation is Lauritzen v. Larsen, 1953, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254. There, the Supreme Court discussed seven factors to be considered in deter- mining the proper choice of law: (1) the place of the wrongful act, (2) the law of the flag, (3) the allegiance or domicile of the injured seaman, (4) the allegiance of the shipowner, (5) the place of contract, (6) inaccessibility of a foreign forum, (7) the law of the forum. It is clear from the Court's opinion that very little weight is to be given the last three, and we will not discuss them further except to note that the articles covering the trip from Bremen to Norfolk were signed on the high seas and validated in New York, and that there is no problem about the accessibility of a foreign forum, as the libellant could have his claim adjudicated by the Hondurian Consul in Norfolk.

Among the various factors set forth in Lauritzen, the most important is the law of the flag. It was there said that "the weight given to the ensign overbears most other connecting events in determining applicable law." 345 U.S. at page 585, 73 S.Ct. at page 930. See also Romero v. International Terminal Co., 1959, 358 U.S. 354, 381 et seq., 79 S.Ct. 468, 3 L.Ed.2d 368. However, if the law of the flag is to control, the flag must not be one of convenience merely but bona fide. Justice Jackson pointed out in Lauritzen, 345 U.S. at page 587, 73 S.Ct. at page 931:

"But it is common knowledge that in recent years a practice has grown, particularly among American shipowners, to avoid stringent shipping laws by seeking foreign registration eagerly offered by some countries. Confronted with such operations, our courts on occasion have pressed beyond the formalities of more or less nominal foreign registration to enforce against American shipowners the obligations which our law places upon them."

Many cases, both before and after Lauritzen, have refused to enforce such nom-

1.  Under Hondurian law, for the particular injury here, the libellant would receive compensation equivalent to two-thirds of his weekly wage for seven weeks.

inal foreign registration by disregarding flags of convenience. Gerradin v. United Fruit Co., 2 Cir., 1932, 60 F.2d 927; Carroll v. United States, 2 Cir., 1943, 133 F.2d 690; Bartholomew v. Universe Tankships, Inc., 2 Cir., 1959, 263 F.2d 437; Zielinski v. Empresa Hondurena De Vapores, D.C.S.D.N.Y.1953, 113 F.Supp. 93.[2] Turning to the present case, the only contacts the Margaritis had with Honduras were the flag and articles. The ship was owned by a Liberian corporation, all of whose stock was owned by Greek and American citizens. The orders directing the movements of the vessel came partly from the American and partly from the Greek owners. The members of the crew were residents of Greece, except for two residents of the United States. The injury occurred in an American port. In fact, the vessel had never, in any of its voyages, visited a Hondurian port. We cannot, confronted with such an absence of any significant contacts with Honduras, uphold the shipowner's contention that Hondurian law should have been applied. The flag was nothing more than illusory.

One further facet of this problem merits discussion. The record in this case reveals that the significant contacts were with two countries, the United States and Greece. However, neither side, either in the District Court or in this court, suggested that Greek law should have been applied, or introduced below any evidence of what the Greek law was. Under such circumstances, the question arises whether this court should on its own initiative examine the record to determine if sufficient contacts with the United States existed to permit a Jones Act suit, or whether, in the alternative, the case should be remanded for proof and application of Greek law.[3] However, we do not have to decide whether it would be appropriate for this court to remand for the application of a country's law neither contended for nor proven, for we conclude that the District Court was not clearly in error in holding that the contacts with the United States were substantial enough to warrant applying the Jones Act.

The only evidence offered by the shipowner relevant to the applicability of the Jones Act consisted of answers to certain interrogatories propounded by the libellant and the testimony of Riley M. Gregory, a partner in Hasler & Company, the shipowner's Norfolk agent. In

2. Moreover, even in situations where the flag was not shown to be merely one of convenience, other considerations have been held to justify the application of the Jones Act to ships of foreign registry. The Supreme Court in the Lauritzen case held that the law of the flag was the most important element, not that it was always the controlling element, and the Court recognized that heavy countervailing considerations might override it. In Uravic v. F. Jarka Co., 1931, 282 U.S. 234, 51 S.Ct. 111, 75 L.Ed. 312, the Court, in an opinion by Mr. Justice Holmes, held that where the seaman was an American and the injury occurred in an American port, the seaman could sue under the Jones Act even though the ship was German. On the other hand, Romero v. International Terminal Co., 1959, 358 U.S. 354, 79 S.Ct. 468, 3 L.Ed.2d 368, held that the mere fact that the injury happened while the ship was in American waters was not, standing alone, sufficient for the application of American law. For other cases holding that Jones Act applicable where the injuries occurred on foreign ships, see: Gambera v. Bergoty, 2 Cir., 1942, 132 F.2d 414; Kyriakos v. Goulandris, 2 Cir., 1945, 151 F.2d 132; cf., The Paula, 2 Cir., 1937, 91 F.2d. 1001; O'Neill v. Cunard White Star, 2 Cir., 1947, 160 F.2d 446. In discussing these Second Circuit cases, and others, the Supreme Court in Lauritzen observed: "No two of these cases present exactly the same basis for application of American law and their contrary results do not necessarily mean inconsistency. But they illustrate different considerations which influence choice of law in maritime tort cases." 345 U.S. at page 574, note 3, 73 S.Ct. at page 924.

3. In Lauritzen v. Larsen, supra, although the injury happened in Cuban waters, the two parties argued for the application of American and Danish law, respectively. The Court, in discussing the weight to be given to the place of the injury, observed that they need not decide the point, as neither party urged that Cuban law was controlling.

the interrogatories, the shipowner, Southern Cross Steamship Company, was asked to state the names, addresses and citizenship of all stockholders or persons holding an interest in the company. The shipowner answered that at the time of the injury, 20% of the corporate stock was owned by an American, Mr. Stephen Perry, residing in New York, and 80% of the stock was owned by Greek citizens. Although the answers gave the name and address of the American owner, the names and addresses of the Greek owners were not given even though expressly asked for. In response to a question about who gave the operating instructions for the Margaritis, the shipowner stated that such orders were given by both the Greek owners and the American owner. The shipowner was also asked to list the voyages of the Margaritis for a period of two years prior to the injury. The answer listed thirteen voyages of which nine were either to or from United States ports. None of the voyages listed were to or from Greek, Liberian, or Hondurian ports. The answers to the interrogatories were signed in New York by the President of Southern Cross Steamship Company, Stamatios Perivolaris, presumably one of the Greek owners. This fact, plus the refusal to give the names and addresses of the Greek owners, lends some support to the libellant's contention that some, at least, of the Greek owners were actually residents of the United States and that the ship was really controlled from New York.

The evidence given by Mr. Gregory, a partner in the firm acting as the shipowner's Norfolk agent, was the only other evidence offered by the shipowner on this question. Mr. Gregory's testimony supports the view that the vessel was controlled from New York. He testified that, as far as he knew, the Southern Cross Steamship Company was a New York corporation located at No. 1 Broadway in New York City. He was asked what was the connection between Southern Cross and the Eastern Steam-ship Agency, Inc., located at the same address, and he replied that he did not know. It is asserted by the shipowner that Eastern Steamship was just the general agent of Southern Cross. However, Gregory testified further that as far as Hasler & Company was concerned, Eastern Steamship Agency controlled the vessel and directed its operations Eastern Steamship Agency had reimbursed the Norfolk agent for all of the bills in connection with the ship and with the libellant's injury in Norfolk. It is also noteworthy that the cable address of Eastern Steamship is "Perivolari, New York," which is essentially the same as the name of the President of Southern Cross, the owner of the ship.

The above facts, although meagre, are not disputed. They do indicate that the effective control of the vessel was by American interests. This, coupled with the fact that the injury occurred while the ship was in drydock in an American port and with the ship's Hondurian registration being illusory, is sufficient under the doctrine of Lauritzen v. Larsen, supra, for the application of the Jones Act. In Bartholomew v. Universe Tankships, Inc., 2 Cir., 1959, 263 F.2d 437, 440, the court, after reviewing the many cases in this area said:

"It is apparent then that the contacts considered most vital in one case are not necessarily of controlling importance in another.

"Hence it must be said that in a particular case something between minimal and preponderant contacts is necessary if the Jones Act is to be applied. Thus we conclude that the test is that 'substantial' contacts are necessary."

In the instant case, the District Court was not in error in finding that substantial contacts existed with the United States, warranting the invocation of American law.

II.   Liability For Double Wages.

With regard to the libellant's claim for double wages under 46 U.S.C.A.

§ 596,[4] the District Court found, upon uncontradicted testimony, that when the new master took charge in Germany prior to the vessel's departure for Norfolk, the crew had not been paid their full wages due at that time. The ship left Germany on March 13, 1958, and later that day, evidently while at sea, a copy of a wage account was given to Firipis by the new master. That account reveals that there was then due him over 28 pounds in wages. Firipis testified that he had never received this money, and there is nothing on the copy of the wage account indicating that he did receive it. As the District Judge observed, the original wage account presumably was in the possession of the respondent, but it has never been produced, nor has any receipt ever been produced for the wages due on March 13, 1958. Moreover, no testimony or other evidence was presented by the shipowner indicating that these wages were ever paid.

After his injury, the libellant made a demand for wages and was paid $53.54 on April 2, 1958, at the United States Public Health Service Hospital by Hasler & Company, the respondent's Norfolk agent. This sum covered his wages from March 13, 1958, to April 1, 1958. Unpaid wages were claimed by Firipis when his libel was filed on April 14, and the claim for wages up to March 13, was repeated in his deposition on August 21, 1958. The District Judge stated:

"Respondent's actions on the wage controversy are indeed strange. The production of a receipt for wages due on March 13, 1958 bearing libellant's signature, would put an end to this disputed issue of fact. If the wages were in fact paid 'at sea' on that date, the original receipt must still be available. Even the testimony of the master, or other officer paying the wages to the crew, would have been of some assistance, but to rely merely on a wage account bearing no identifiable signature or name affords no defense. The respondent owner has violated the statutes of the United States and is properly subjected to the waiting time provisions. Giving the shipowner the benefit of a doubt in erroneously assuming that the wages had been paid in full on April 2, 1958, there remains no excuse for this continued assumption after the libellant testified on August 21, 1958. Until these wages are paid in full, respondent shall be liable under the waiting time statute for each day since August 22, 1958 plus the amount actually due." [181 F.Supp. 53]

Although the District Court seemed to have found that the failure to pay wages on April 2 was not justified, it did not assess double wages until after August 21. What prompted giving the ship-

---

4. The statute provides:

"The master or owner of any vessel making coasting voyages shall pay to every seaman his wages within two days after the termination of the agreement under which he was shipped, or at the time such seaman is discharged, whichever first happens; and in case of vessels making foreign voyages, or from a port on the Atlantic to a port on the Pacific, or vice versa, within twenty-four hours after the cargo has been discharged, or within four days after the seaman has been discharged, whichever first happens; and in all cases the seaman shall be entitled to be paid at the time of his discharge on account of wages a sum equal to one-third part of the balance due him. Every master or owner who refuses or neglects to make payment in the manner hereinbefore mentioned without sufficient cause shall pay to the seaman a sum equal to two days' pay for each and every day during which payment is delayed beyond the respective periods, which sum shall be recoverable as wages in any claim made before the court; but this section shall not apply to masters or owners of any vessel the seamen of which are entitled to share in the profits of the cruise or voyage. This section shall not apply to fishing or whaling vessels or yachts. * * *"

owner this amelioration is not entirely clear.

The shipowner argues that either the District Judge must award penalties for non-payment of wages from the end of the 24-hour period after the cargo has been discharged, or within four days after the seaman has been discharged, or no penalties at all may be awarded. It is asserted that by not imposing penalties from April 2, 1958, but having them run rather from August 22, the District Court found that the failure to pay wages when due was with sufficient cause and that under the statute such failure cannot at some later date become inexcusable. It should be noted at the outset that the shipowner's argument is based upon a false premise. The District Court did not find that the failure to pay wages in April, 1958, was justified. In fact, the District Judge's opinion plainly enough indicates that the retention was without sufficient cause. What the District Judge did was, in the exercise of his discretion, to give the shipowner the benefit of any doubt and relieve him of the double wage obligation for a portion of the period. It would seem that the shipowner has no cause to complain of this, and the seaman does not appeal from such action.

The shipowner's reliance is upon McCrea v. United States, 1935, 294 U.S. 23, 55 S.Ct. 291, 79 L.Ed. 735, reargument denied 1935, 294 U.S. 382, 55 S.Ct. 443, 79 L.Ed. 933. There, the libellant, a seaman on the S.S. American Shipper, demanded, when the ship was in a foreign port, that he be given his discharge and the wages due him. He cited to the master certain statutes dealing with the failure to make proper division of the crew into watches and with the duty of American Consuls in foreign ports to inquire into claims by seamen that they are entitled to their discharge because of the unseaworthiness of the vessel, etc. The master asked the seaman to meet him at the American Consul's office the next day. When the seaman arrived at the Consulate, he was informed that he was not entitled to discharge, and left before the master arrived. The master did not see the libellant afterwards, and the following day the libellant left the ship without ever again returning. Suit was later filed for wages due and double wages for waiting time. The District Court held that the seaman had been entitled to his discharge and wages, that the master however had sufficient cause to withhold them when the demand was made, but that the seaman later became entitled to double wages for the number of days of retention after suit was brought.

The Supreme Court assumed for argument's sake only that the seaman had been entitled to his wages and that the master's only valid excuse for non-payment was that the seaman did not contact him after the initial demand. The Court held that under such circumstances, the seaman was not entitled to double wages for the period following initiation of the suit. The Court stated with respect to the statute, 294 U.S. at pages 31–32, 55 S.Ct. at page 295:

"Petitioner seeks, by a more liberal interpretation of the words, to impose the liability for such delay in payment, without sufficient cause, as may occur at any time *after an excusable failure to pay within the prescribed period.* This possibility is precluded by the further provision of the section that double wages shall be paid for each day 'during which payment is delayed beyond the respective periods' within which the payment is to be made. Thus, liability for double wages accrues, if at all, from the end of the period within which payment should have been made. It must be determined by the happening of an event within the period, failure to pay wages without sufficient cause. The statute affords a definite and reasonable procedure by which the seaman may establish his right to recover double pay where his wages are unreasonably withheld. *But it affords no basis for recovery if, by his own conduct, he precludes compliance with*

*it by the master or owner. He can-*
*not afterward impose the liability*
*by the mere expedient of bringing*
*suit upon it."* (Emphasis supplied).
See also The A. I. Baker, 6 Cir., 1935, 76 F.2d 871. As previously mentioned, in the present case, contrary to McCrea, there was no finding of excuse or justification within the period during which wages should have been paid. Moreover, even if there had been facts indicating some justification for withholding wages for a time, there is no suggestion that any conduct of the seaman contributed to the delay.

With regard to liability for double pay, a doctrine had developed before the McCrea case, and has continued to the present time, that the District Court has a measure of discretion through the application of equitable principles in determining the number of days for which double wages should be assessed. McCrea did not purport to overrule this line of cases. In spite of the statutory language appearing to require the assessment for every day that payment is wrongfully withheld until actual payment, the Supreme Court in Pacific Mail S.S. Co. v. Schmidt, 1916, 241 U.S. 245, 36 S.Ct. 581, 60 L.Ed. 982, held that, because of the particular circumstances of that case, penalties should stop at the time of the District Court's decree and not run during the pendency of the appeal. Other cases have likewise held that where payment is withheld without cause, double wages need not always be allowed for every day until actual payment, but may in appropriate circumstances be limited to a shorter period because of particular equities. Mystic S.S. Co. v. Stromland, 4 Cir., 1927, 20 F.2d 342; Mavromatis v. United Greek Shipowners Corporation, 1 Cir., 1949, 179 F. 2d 310; Forster v. Oro Navigation Company, D.C.S.D.N.Y.1954, 128 F.Supp. 113, affirmed 2 Cir., 1955, 228 F.2d 319; The Chester, D.C.D.Md.1928, 25 F.2d 908.

While in the above cases assessments for waiting were made from the beginning of the prescribed statutory period and discretion was exercised to shorten the period to some specified date before actual payment, there have also been cases where the limitation has been placed at the opposite end of the period of retention. In other words, in these cases the courts did not begin the double wage allowance until sometime beyond the date when payment of wages should have been made. Swanson v. Torry, 4 Cir., 1928, 25 F.2d 835; Samad v. The Etivebank, D.C.E.D.Va.1955, 134 F. Supp. 530; Spero v. Steamship The Argodon, D.C.E.D.Va.1957, 150 F.Supp. 1.

■ Certainly, McCrea v. United States, supra, holds that where some fault of the seaman furnishes justification for the initial failure to pay wages at the prescribed time, the shipowner is not to be held to the double wage liability even if the excuse for non-payment later becomes inapplicable. Moreover, the Supreme Court's opinion in McCrea indicates that even if facts other than the seaman's conduct constitute a legally sufficient excuse for non-payment of wages at the time prescribed in the statute, normally no double wages will be imposed for a later period after the excuse ceases to exist. However, we do not think that the rule laid down in McCrea is as far-reaching as the shipowner's contention in the instant case. Fact situations may arise where the District Court finds the shipowner's conduct sufficiently inexcusable to render him liable for double wage penalties. However, equities not amounting to justification may be found to have existed when the wages fell due and which later became inapplicable. The District Court may in such circumstances properly postpone the running of double wages, confining them to the period after any equity supporting the shipowner's action has disappeared.

### III. Other Points Raised by the Shipowner.

■ The appellant's remaining claims of error require less extensive treatment. The shipowner also contests the awards for wages and waiting time on the ground that Firipis was paid in full for the voyage ending in a United States port in April, 1958, and that his claim for

wages relates to a previous voyage ending at Bremen, Germany, in March, 1958. To support its position that a separate voyage began from Bremen on March 13, 1958, the shipowner points to the new articles signed after the ship left Bremen. It is asserted that any failure to pay wages occurred on March 13 in a foreign port, and because of this, no suit will lie under the American law for such wages.

It is not clear whether the voyage from Bremen to Norfolk was considered a separate voyage or not. Where the ship had been immediately prior to its arrival in Bremen, or what the previous articles contemplated is not revealed by the record. It is clear, however, that Firipis signed a one year employment contract in April, 1957, and that under it wages were due. Whether the period for which they were due was a separate voyage, thereby having rendered the shipowner liable in Bremen on March 13, need not be decided. Under circumstances such as these, it has been expressly held that such past wages from a previous voyage, plus double wages, may be the subject of suit in this country after the ship reaches an American port. Mavromatis v. United Greek Shipowners Corporation, 1 Cir., 1949, 179 F.2d 310, 317, 319. See also Korthinos v. Niarchos, 4 Cir., 1949, 175 F.2d 730.

■■ The shipowner attacks the District Court's finding of fact that oil on the deck caused the libellant's fall, asserting that in arriving at this finding, the District Court made improper inferences. In its opinion, the District Court pointed out that only one officer and one seaman were called as witnesses by the shipowner, although there were several other members of the crew in the area at the time of the injury. The court, after discussing this aspect in detail, said: "The unexplained failure to call material witnesses raises an inference that such witnesses, if permitted to testify, would not support the defense as advanced by respondents." [181 F.Supp. 49] We think that such an inference, in the circumstances of this case, was not unjustified. See The New York, 1899, 175 U.S. 187, 204, 20 S.Ct. 67, 44 L.Ed. 126.[5] It is also argued that the District Court drew an inference from the shipowner's refusal to pay maintenance that oil on the deck caused the libellant to fall. Of course, such a bald inference would be illogical, but we do not think that the court intended any such thing. After reviewing the relevant evidence, the court did refer to the shipowner's failure to pay maintenance. This was, perhaps, a factor the court took into consideration as bearing upon the credibility of the shipowner's theory. However, the finding of fact that oil upon the deck caused the fall was supported by direct testimony and is not clearly erroneous. The mere recital in the District Court's opinion that the shipowner failed to pay maintenance at a time when the libellant was not yet cured is not sufficient to upset the court's finding of fact as to the cause of the injury.

■ The appellant complains of the District Court's final decree requiring deposit of earned wages and double wages in the registry of the court in order to stop the running of double pay pending appeal. It is argued that under Pacific Mail S.S. Co. v. Schmidt, 1916, 241 U.S. 245, 36 S.Ct. 581, 60 L.Ed. 982, penalties can *never* run beyond the date of the District Court's decree. Of course, the language of the statute indicates that penalties run until actual payment, whenever it might be. However, as we pointed out previously, the Pacific Mail case held that particular circumstances might make it appropriate to shorten the period. That case did not hold that liability for waiting time always stops with

---

5. The shipowner relies upon Pacific-Atlantic S.S. Co. v. United States, 4 Cir., 1949, 175 F.2d 632, but that case is not in point, as there, only two out of dozens of witnesses were not called. This court recognized that in those circumstances, the general rule permitting an inference from the failure to call witnesses was not applicable.

the trial court's decree.[6] We need not decide here whether double wages could have been imposed pending appeal, as the order of the District Court limited the shipowner's liability to the date of the decree and furnishes it no proper ground for complaint. It would seem to be no abuse of discretion to require such payment into court, thereby protecting the shipowner against increased liability and insuring payment to the seaman.

◼ Finally, it is asserted that the court erroneously refused to consider a letter that Hasler & Company, the shipowner's Norfolk agent, sent to the shipowner in New York, after paying the libellant his wages for the period from March 13, 1958, to April 1, 1958, stating that the libellant had been paid in full.

In the first place, there is no evidence that the court refused to consider this letter. In fact, it might have been because of such letter that the District Court postponed the running of double wages. Moreover, this letter of the Norfolk agent constitutes no justification for failing to pay the wages due for a period prior to the ship's departure from Bremen on March 13, 1958. The appellant advances no reasons why the mere assertion by a ship's local port agent, who enters the case later, excuses an otherwise unjustified failure to pay a seaman's wages. Something more would have to be shown.

For the above reasons, the decree of the District Court is

Affirmed.

6. In fact, the Court in Pacific Mail expressly refrained from ruling upon this question, 241 U.S. at page 251, 36 S.Ct. at page 583.