Paraskevas PERDIKOURIS, Libellant,

v.

THE Liberian S/S OLYMPOS, her boats, tackle, etc., in rem, and Monovar Compania Naviera, S.A., as owners, et al., in personam, Respondents.

No. 440.

United States District Court
E. D. Virginia,
Newport News Division.

Aug. 18, 1961.

850

Burt M. Morewitz, Newport News, Va., for petitioner.

Vandeventer, Black, Meredith & Martin, Walter B. Martin, Jr., Norfolk, Va., for respondents.

WALTER E. HOFFMAN, District Judge.

The libel filed herein alleges causes of action for (1) earned wages, (2) "waiting time," (3) a claim for injuries by reason of the negligence of the ship's officers and crew, together with a contention of unseaworthiness, and (4) a claim for maintenance and cure.

The parties have stipulated that the sum of $200 is due under the first and second causes of action. Not included in this stipulation is a claim for sick wages.

In support of his claim for damages occasioned by injuries sustained by libellant, we are told, and the evidence supports the fact, that in 1956 libellant allegedly slipped on some oil on the floor of the engine room. While the date of occurrence is not clear from the testimony, apparently it took place on a voyage from Europe to Norfolk between June 28, 1956, and July 13, 1956. The injury resulted in a slight sprain of the right knee, but was of no consequence and libellant continued to work until his second injury in November, 1957. There is no causal relation between the injury of 1956 and the complaints as alleged in the libel.

On November 24, 1957, libellant again fell while descending a short ladder approximately four feet high. Libellant contends that the vessel was unseaworthy in that no handrails were provided. The record is devoid of any evidence tending to show that steps or a ladder of this height should be equipped with handrails. The stairway or staircase was described as being perpendicular and approximately 1.70 meters long.

The stairs went from the engine room to the tunnel, where libellant was intending to grease the bearings of the propeller shaft. Common sense dictates that ladders of this type and in this location aboard ship are not accustomed to being equipped with handrails or hand-supports. There is no description as to what may have been at the head of the ladder to enable a seaman to approach the first rung of same. The mere conclusion by libellant that the ship was unseaworthy, without credible evidence to support same, is unworthy of consideration. The third cause of action must be dismissed.

After libellant returned to Greece following his confinement in the United States Public Health Service Hospital at Norfolk from November 28, 1957, until December 12, 1957, he executed a release of his claims against the vessel and its owners. This is the subject of a prior memorandum, the details of which need not be repeated. Perdikouris v. S/S Olympos, D.C.E.D.Va., 185 F.Supp. 140.

When discharged from the hospital at Norfolk, libellant was fit for travel but not fit for duty. He was transported to Greece where he was treated from January 8, 1958, until sometime in March. Subsequent to March 12, 1958, respondents made no further payments for medical and hospital treatment. It was on this latter date that the settlement was approved by the Greek court and which, according to this court, can operate only as a credit upon the recovery, if any, in the present proceeding.

The main force of respondents' argument on the claim for maintenance and cure lies in the proven fact that libellant had a congenital condition in both knees. In 1955 he underwent an operation for the removal of a cyst of the left outer (external) meniscus. He also complained of pain in the right knee but, according to the Greek surgeon, both knees cannot be operated on at the same time. Libellant was advised to undergo an operation on the right knee if it was giving him any pain. This he failed to do, although the testimony does not reflect that he had any particular trouble with his right knee prior to his fall on November 24, 1957, other than the minor injury in the summer of 1956. The left knee had been injured in a football game, and presumably the main complaint was remedied by the 1955 operation.

The sequence of events leads to the belief that the meniscus of the right knee was sprained or ruptured by the accident of November 24, 1957, while the vessel was at sea enroute to Newport News. Libellant remained in bed thereafter until the vessel anchored on November 26, 1957, at 8 A.M. He was taken to a doctor at 10 A.M. and returned at 2 P.M. with his leg in a cast. Again he went to bed, but was discharged on November 28 when it became apparent that he would be required to enter the hospital. The hospital record is of little value, the diagnosis being a strain of the right knee, but libellant had advised the hospital of a prior operation for a "torn ligament" of the left knee in 1955. Manifestly libellant did not know the details of any congenital condition involving the meniscus of both knees, although clinical record reflects an operation for "lateral meniscus" of the left knee in 1955. The impressions indicated a possible sprain or "possible meniscus". A consultant, Dr. Foy Vann, reported that "the mechanics of his injury is difficult to determine," but made a provisional diagnosis of "knee strain—no treatment suggested." X-rays revealed nothing of significance and, as related by Dr. John Vann, a ruptured meniscus cannot be determined by X-ray. When libellant was initially taken to the same hospital, the record indicates that he was told "he had a torn medial meniscus." Obviously there was a conflict in the views of Dr. Foy Vann and one of the hospital surgeons, as the discharge note states that Dr. Vann thought that libellant "only had strain— no meniscus involved", whereas, the impression of at least one hospital surgeon was a "torn medial meniscus".

Dr. John Vann, the son of Dr. Foy Vann, examined libellant on December 14, 1957, at the request of respondents. A capable orthopaedic surgeon, Dr. John

Vann stated that there was no atrophy, a full range of motion, and a superficial nodular thickening just below the knee-cap. He expressed the opinion that some atrophy would be noticeable between November 24 and December 14, if the trauma had been severe. The meniscus could be activated by normal walking, and would not require a trauma to cause trouble in the knee. Dr. Vann further testified that he did not believe that libellant had a ruptured meniscus as all tests were negative and that, if a ruptured meniscus existed, some of the tests would have been positive as it is not particularly difficult to determine if there is a torn meniscus. The fact remains that it was difficult to diagnose from the opinion of Dr. Foy Vann and the hospital surgeons, as well as from the Greek surgeons.

Libellant was examined on four or five occasions between January 8 and March 12 by Dr. Irenis in Athens, Greece. His initial impression was "hydrarthrosis at the right knee joint." Upon his discharge by Dr. Irenis shortly prior to March 12, libellant was seen by Dr. Houpis, a specialist in the diseases of the meniscuses. This visit and his subsequent treatment were at libellant's expense. Upon taking an arthro-pneumatogram of the knee joint, the suspicion of a rupture at the internal right meniscus was confirmed in the opinion of Dr. Houpis.[1] With his present impairment of the knee, Dr. Houpis, upon taking into consideration the libellant's occupation as a seaman, estimates his disability at from 70 to 80 per cent. It should be noted, however, that this is not a true estimate of functional disability as it is connected with libellant's occupation as a seaman. Dr. Houpis likewise pointed out that, absent an operation, the percentage of disability may increase through the development of a degenerative osteo-arthritic disease. He further stated, somewhat contrary to the view of Dr. John Vann, that the rupture of the meniscus is al-

ways a matter of traumatic causation.[2] Libellant's present condition is that he is capable of walking on level ground without difficulty, but in ascending or descending stairs or walking on uneven ground he incurs trouble and pain.

Dr. Houpis first testified on August 28, 1958. He was recalled for further testimony in January, 1961. He reiterated his prior testimony and, in the interim, he had examined libellant as recently as December, 1960. Dr. Houpis likewise clinically examined the libellant on the same day that he testified. He stated that he had examined the libellant approximately once each month since August, 1958, when he first testified. During all of this time there had been no improvement and, in the opinion of Houpis, an operation is required to restore the "functionable condition of the knee." In further explanation of his prior testimony, Dr. Houpis related that a rupture of the meniscus is *not* a congenital ailment and, in addition, congenital diseases of the meniscus generally affect the external meniscus, whereas libellant's complaint is centered on the internal meniscus.

An arthroradiogram was taken by Dr. Caravias, to whom libellant was originally referred by Dr. Irenis, during early January, 1961. When Dr. Caravias examined libellant in the spring of 1958, he performed only a detailed clinical examination which was of little or no assistance in arriving at a conclusion. The later conclusion in 1961 was that libellant was suffering from a diseased meniscus of the right knee. It should be noted, however, that these films were taken more than three years after the injury. True, the existing atrophy, if any, is minimal and, according to Dr. Caravias, some atrophy would appear if there had been an injury to the meniscus which had not been treated surgically. As Dr. Caravias explains the problem, if there is an injury resulting in a rupture of the meniscus, the

1. The 1955 operation was at the left external meniscus.

2. This view is not necessarily in conflict with Dr. Vann, as a traumatic causation may be in the nature of normal walking. Another surgeon in Greece stated that a rupture of the meniscus is a condition caused by trauma.

symptoms appear immediately; if there is a congenital abnormality of the meniscus, the symptoms are lighter than those of a rupture and may manifest themselves after a strain of the knee. As to the ability to work, patients suffering from congenital abnormalities of the meniscus are able to work until such time as pain and malfunction manifest themselves; patients suffering from a ruptured meniscus must stop work at once and, after treatment for an undetermined period, they may resume work until they again strain the knee, and ultimately they must undergo an operation.

The suggested operation involving the removal of the meniscus is inexpensive, and the continued period of disability would not exceed two months at the most. As with any operation there are some dangers occasioned by complications, but libellant is not in a position to complain for the reason that, if he is unwilling to undergo the operation, he has in that event long since arrived at the maximum state of cure. However, the position of libellant has been that he seeks the operation, but has been unable to pay the cost thereof. The total expense involved if the operation is performed in Greece should not exceed $250 to $300 in United States Currency. The expenses in United States would be approximately the same amount. With disability limited to six weeks or two months, it is quite apparent that the costs of this litigation will far exceed what would have been expended for an operation to determine whether libellant was suffering from a ruptured meniscus, a strain of the knee which activated a congenital condition of the meniscus, or a mere cyst which may have been related solely to the congenital condition.

■■ Whether libellant actually sustained a ruptured meniscus or a strain or sprain which activated a congenital condition is unnecessary to determine. The fact remains that libellant was injured aboard ship and he is entitled to maintenance and cure until he reaches a maximum state of recovery. The injury or illness need not result from or be in any way causally related to libellant's shipboard duties. Calmar S. S. Corp. v. Taylor, 303 U.S. 525, 58 S.Ct. 651, 82 L. Ed. 993.

The problem presented is not unlike many other instances involving Greek seamen employed on "flag of convenience" vessels. The seaman may be a ward of admiralty in the United States, but the shipowner occupies this position in Greece. Under Greek law, a seaman is entitled to treatment for a maximum period of four months, after which, as expressed by one Greek legal expert, "he is left to die." True, under certain circumstances a seaman who qualifies by reason of his length of service and other requirements may receive treatment as an indigent beyond the four-month period, but, according to Greek law, the shipowner is relieved of all responsibility at the time stated.

■ If the Greek law is applicable in cases involving an injury or illness to a Greek seaman, irrespective of the flag the vessel flies or the country of corporate ownership, then the respondent must prevail as there is insufficient evidence establishing the fact that an apparent need for an operation was made within the fourth-month period. In the present case the flag of the vessel was that of Liberia; the respondent-owner, Monovar Compania Naviera, S. A., is a Panamanian corporation; the operating agent is a corporation of the United Kingdom. Respondents stress the dicta of Chief Judge Soboloff in Southern Cross Steamship Co. v. Firipis, 4 Cir., 285 F.2d 651, 654, wherein there is some intimation that the Greek law, had it been presented to the trial judge, *may* have been applicable. On this point, Judge Soboloff said:

> "The record in this case reveals that the significant contacts were with two countries, the United States and Greece. However, neither side, either in the District Court or in this court, suggested that Greek law should have been applied, or introduced below any evidence of what the Greek law was. Under such circum-

stances, the question arises whether this court should on its own initiative examine the record to determine if sufficient contacts with the United States existed to permit a Jones Act [46 U.S.C.A. § 688] suit, or whether, in the alternative, the case should be remanded for proof and application of Greek law."

In the present controversy the Greek Law was introduced. The ultimate control of the vessel was vested in Greek citizens and the contacts with the United States pertained to voyages to and from this country—a factor which is insufficient to apply the laws of the United States, other than certain statutory provisions which are applicable to seamen on foreign vessels. Respondents urge that, under such circumstances, this Court must and should apply the law of Greece. We do not agree that this was the intent of the "flag of convenience" rule.

The vast majority of Greek seamen employed on "flag of convenience" vessels are initially employed in Greece where, as a rule, a contract is signed by someone acting in behalf of the owners of the vessel and the seamen.[3] The seamen are then sent to another European port where they are signed aboard the vessel. In some instances the wages do not agree with the employment contract. Frequently they are greater, but there are cases in which a lower wage has been fixed by the articles. In the present controversy we do not have this problem as the articles are those specified by the Republic of Liberia and the termination of employment is fixed at one year from July 31, 1957. According to the articles, wages are terminated as to any crew member detached from the vessel through no fault on the part of the vessel or her owners. Therefore, according to the law of Liberia, earned wages terminated on November 28, 1957.

The maritime law of Liberia is set forth in Chapters 1 and 10, and Section 223 of Chapter 8 of Title 22. Under § 30 it is provided;

"Insofar as it does not conflict with any other provisions of this Title, the non-statutory general Maritime Law of the United States of America is hereby declared to be and is hereby adopted as the general Maritime Law of the Republic of Liberia."

There are other provisions of the law of Liberia relating to seamen which are not applicable to this case. It goes without saying that, under the general maritime law of the United States, maintenance and cure is an inherent right granted to a seaman by virtue of his employment relation.

To permit the shipowner to avoid the consequences of his "flag of convenience" by resorting to the laws of the country where the ultimate control rests would do violence to the legal system. It would create a haphazard situation whereby there would be no controlling law. The language of Judge Soboleff as heretofore quoted is admittedly suggestive that the law of the country where the ultimate control rests should govern. There is a strong intimation to the contrary in Kontos v. S. S. Sophie C., D.C.E.D.Pa., 184 F.Supp. 835, 837, affirmed per curiam, 3 Cir., 288 F.2d 437.

The doctrine invoking the flag of convenience was essentially for the benefit of an aggrieved party seeking relief in a forum maintaining substantial contacts with the vessel of a foreign flag. The fact that the flag may be illusory does not destroy the rights of an aggrieved party requesting the applicability of the law of that flag. Nor does it follow that courts of this country should automatically apply the law of the nation where the ultimate control and ownership rests. The aggrieved party most assuredly can proceed in Panama where the owner is incorporated. He could pro-

---

3. In the case under consideration, no contract apparently was signed by libellant. There is in evidence what purports to be an agreement between the master and seamen, but it bears no date and no signatures. It must be disregarded for the purposes of this case.

ceed in rem against the vessel in Liberia, if the vessel ever visited that country which is highly unlikely.[4] With the consent of the flag owners, he could undoubtedly proceed in personam in Greece. If the contacts with the United States are substantial and the flag is illusory, the aggrieved party may look to the laws of this country to the extent of his right to recover for injury.[5] We conclude, therefore, that an aggrieved party may, at his election, look to the law of the flag, and that the parties creating the illusory flag cannot insist upon the application of the law of the country where the ultimate control and ownership rests. This is properly one of the burdens imposed upon those who, for reasons of their own, seek an illusory flag and a corporate entity which is wholly unrelated to the country of ultimate control and ownership.

■ Because the law of Liberia leads us to the general maritime law of the United States, we turn for guidance to the decisions of our own country and shall apply them to the facts of this case. Perhaps there is no more appropriate field in which a seaman should be regarded as a ward of admiralty than on the subject of maintenance and cure. We believe that, in this case, the desire of the shipowner to effectuate a settlement approved by the Greek court was a prime factor in terminating maintenance and cure. Libellant's condition at this time is essentially the same as it was in March, 1958. The evidence does not support the contention that his condition has degenerated but, at the same time, he has not reached a maximum state of cure as all of the testimony points to the fact that a relatively simple operation could bring about great improvement, and in all probability, complete recovery. While the Court does not accept the argument that libellant was so totally disabled as to be incapable of continuously perform-

ing any work, and while there is a duty imposed upon the seaman to mitigate his own damages, there is little excuse for failure to provide the necessities for an operation after the matter came to the attention of the shipowner. Good faith, under such circumstances, is not enough. Sims v. United States War Shipping Adm'n, 3 Cir., 186 F.2d 972, certiorari denied 342 U.S. 816, 72 S.Ct. 31, 96 L.Ed. 617.

It has been three years since Dr. Houpis first testified as to libellant's need of an operation. Prior to August 28, 1958, there is no showing of the need for further medical treatment. Sims v. United States, etc., supra. We do not believe that libellant can seriously urge that respondents are liable for his loss of wages and maintenance during this long period of time. Libellant made no effort to obtain treatment as an indigent person. Apparently he made no affirmative effort to secure employment in an occupation which would not require as much physical exertion as a seaman. On the other hand, the respondents failed in their obligation to provide maintenance and cure beyond March 12, 1958. According to the testimony, maintenance of this libellant only amounted to $1.05 per day. He has expended approximately $100 in medical examinations, and the estimated future expense will be $300. While the record as to damages is highly unsatisfactory, we think that the respondents should be held liable for maintenance for a period of one year from August 28, 1958, and for loss of earnings for twelve months, the same to include the time during which libellant will be recuperating from any operation, if the same is performed. Fixing libellant's loss of earnings at $140 per month, the libellant will recover the total sum of $2,500, together with his taxable costs, less the sum of $237.63 previously paid to libellant in accordance with an order of the Greek

4. Without examining the laws of the Republic of Liberia in detail, there may be some authority to proceed in personam against the owner in Liberia.

5. Aside from the statutory provisions relating to wages, etc., it is doubtful that an aggrieved party may look to the laws of the United States with respect to the internal affairs of the vessel.

856

court, plus the sum of $200 stipulated to be due in settlement of the first and second causes of action.

Present decree in accordance with this memorandum which is adopted by the Court in lieu of specific findings of fact and conclusions of law in accordance with General Admiralty Rule 46½, 28 U.S. C.A.