James W. BRINKLEY, Plaintiff,

v.

H/f EIMSKIPAFELAG ISLANDS, Defendant and Third-Party Plaintiff,

v.

OLD DOMINION STEVEDORING CORPORATION, Third-Party Defendant.

Civ. A. No. 546-70-N.

United States District Court,
E. D. Virginia,
Norfolk Division.

Dec. 9, 1971.

Stuart V. Carter, Norfolk, Va., for plaintiff.

Charles R. Dalton, Jr., Norfolk, Va., for defendant and third-party plaintiff.

Walter B. Martin, Jr., Norfolk, Va., for third-party defendant.

### MEMORANDUM

WALTER E. HOFFMAN, Chief Judge.

Plaintiff, James W. Brinkley, was employed as a longshoreman on July 31, 1968, by Old Dominion Stevedoring Corporation, the third-party defendant. The task on that day was to load rolls of linerboard into the No. 4 hatch of the Icelandic Motor Vessel SELFOSS from the apron of Pier B, Sewell's Point, in Norfolk, Virginia. Plaintiff, Brinkley, was employed as a slinger in the longshoreman's gang of Jerry Britt. He was assisted by a breaster, Richard Bow-

den, an experienced longshoreman normally employed as a gang boss with Southern Stevedoring Corporation who, on this occasion, was working for Old Dominion.

The loading process was as follows. The cylindrical rolls of linerboard, weighing approximately one ton each, were placed on two pieces of framing in a position parallel to the side of the SELFOSS. The rolls were lifted onto the ship by two rope slings. The slings were attached to the ship's cargo hook which was secured to the cargo falls. The ship's winches set the entire process in operation. During this operation, Brinkley was stationed on the pier with his back to the ship between the rolls and the ship's side. The breaster stood across from Brinkley on the other side of the rolls, facing the ship and Brinkley. Brinkley would place a rope sling around one end of the linerboard while Bowden would place the other rope sling around the other end of the linerboard. The breaster would then step back while the slinger, Brinkley, would hold the sling ropes "hand tight," i. e., until the winch took up the slack and the ropes were taut. At this point Brinkley would step back and Bowden would give a hoist signal to the gangwayman stationed on the main deck, after first seeing that Brinkley was clear of the load. In turn, the gangwayman would relay the signal to the winch operator who would activate the hydraulic winch, hoisting the rolls of linerboard into the hold of the ship.

At approximately 10:30 a. m., after the loading operation had been under way for two hours, the alleged accident occurred. The left leg of Brinkley's loosefitting coveralls became caught between the rope sling and the linerboard as the cargo was being raised, and Brinkley was elevated into the air. The gangwayman saw the situation and instructed the winch operator to stop the draft. At this point, Brinkley was suspended momentarily a distance of five to six feet above the dock, held only by his pants leg. As the draft was being lowered, Brinkley's coveralls slipped from between the sling and linerboard roll. Brinkley fell to the asphalt dock onto his left buttock.

It was not until October 1968 that Brinkley sought medical help for recurring back pain. He subsequently underwent an operation for a large ruptured disc which was removed from his fourth lumbar interspace on the left side of the spine.

Subsequently the plaintiff filed a complaint against the shipowner, H/f Eimskipafelag Islands, alleging damages in the sum of $75,000. Thereafter H/f Eimskipafelag Islands filed a third-party complaint against Old Dominion Stevedoring Corporation, the plaintiff's employer during the accident in question. The cause matured and the case was heard without a jury.

A number of interesting issues are presented to this court by the above set of facts. As the defendant and third-party plaintiff, H/f Eimskipafelag Islands, states in its well-prepared brief, a factually close question is raised as to whether or not the accident actually occurred.

The testimony of plaintiff, Brinkley, is supported by two of his fellow longshoremen. John Custis, a gangwayman, testified that he witnessed the entire accident from a distance of not more than fifteen feet, while he was positioned on the deck of the SELFOSS. Trance Hyman was the winch operator that day in the gang that was performing the cargo operation on board the SELFOSS. He did not see Brinkley being picked up by the winch because his view of the dock was blocked by the ship. However, after hearing the gangwayman's signal to stop, Hyman observed Brinkley's leg caught in the rope sling of the load. John Britt, the gang boss, recalled seeing Brinkley during the lunch break on the day of the accident lying on the top of a boxcar. Brinkley complained to Britt that he (Brinkley) was "hurting" but never explained the circumstances or source of his "hurt." This eyewitness testimony weighs heavily in Brinkley's favor although other circumstances may

give rise to some suspicion by reason of numerous conflicts.

The defendant, H/f Eimskipafelag Islands, points out that Brinkley continued to work a full day after the fall, as well as putting in a full day of work the next day. In fact, Brinkley worked nearly every time that his gang worked for two months after the accident, notwithstanding the alleged back injuries he received from the accident of July 31. The defendant and third-party defendant are quite amazed that Brinkley was able to continue working for over two months after suffering such a reportedly serious fall.

The defendant, H/f Eimskipafelag Islands, is also concerned about the fact that the accident of July 31, 1968, was unreported, while an accident the next day, on August 1, 1968, which also caused injury to Brinkley's back, was reported by Brinkley according to normal procedure of the stevedoring company. In the accident of August 1, 1968, Brinkley slipped and fell on the wet apron of a pier during a loading operation on another ship, the BOSTON MARU.

At this point it should be mentioned that on July 30, 1970, Brinkley filed two separate suits against two different shipowners styled James W. Brinkley v. H/f Eimskipafelag Islands, Civil Action No. 546–70–N, and James W. Brinkley v. Nippon Yusen Kaisha, Civil Action No. 547–70–N. These actions were unique in that claimant sought a recovery from two separate shipowners for a single injury, a ruptured disc, as a result of separate and unrelated accidents which occurred on July 31, 1968, and August 1, 1968. Old Dominion Stevedoring Corporation was joined as a third-party defendant in each case. In the case of Brinkley v. Nippon Yusen Kaisha, summary judgment was entered for Nippon Yusen Kaisha by the Honorable John A. MacKenzie, United States District Judge for the Eastern District of Virginia.

Immediately after the accident of July 31, Brinkley, according to testimony, went to his car, changed his pants, and proceeded to the timekeeper's office of Old Dominion Stevedoring Corporation to report the accident. The timekeeper's office was empty, so Brinkley allegedly reported the accident to "Sonny" Breeden in the office of Atlantic & Gulf Stevedores, Inc., since, on past occasions, the timekeepers of Atlantic & Gulf had assisted employees of Old Dominion when Old Dominion ran short of timekeepers. When Carl W. "Sonny" Breeden was called to the witness stand, he testified that he was employed by Atlantic & Gulf Stevedores as a stevedore foreman, not as a timekeeper, and had never been a timekeeper. He further stated that he did not assist in loading the SELFOSS on July 31, 1968, nor was there an accident reported to him on that date by Brinkley or anyone else. Records of the Atlantic & Gulf Stevedoring Corporation reveal that neither Carl W. Breeden nor Atlantic & Gulf was working a ship at the same pier on July 31, 1968.

The defendant further states that since the plaintiff failed to call Richard Bowden, the breaster, an adverse inference is raised as to the occurrence of this accident. The defendant maintains that since Bowden was in the best position to confirm the accident, if it did happen, being the closest one to Brinkley at the time, presumably Bowden would have refuted the occurrence of such a casualty.

In Blow v. Compagnie Maritime Belge (Lloyd Royal) S.A., 395 F.2d 74, 79 (4 Cir., 1968), it was said:

> "It is well settled that the unexplained failure of a party litigant to call a material witness to give evidence in his behalf supports an inference that such witness, if permitted to testify, would testify against the interests of a party failing to present this testimony."

See also Southern Cross Steamship Co. v. Firipis, 285 F.2d 651, 659, 84 A.L.R. 2d 895 (4 Cir., 1960), cert. denied 365 U.S. 869, 81 S.Ct. 903, 5 L.Ed.2d 859.

We feel that those cases are readily distinguishable from the set of facts at

hand. In both of the above-cited cases, the material witnesses that were not called were employees of the shipowner being sued by the injured longshoreman or seaman. Since the witnesses were employees of the shipowner, they were not equally available to the injured plaintiffs. Illinois Central Railroad Co. v. Staples, 272 F.2d 829, 834 (8 Cir., 1959). In the case at hand, the defendant urges an inference against the plaintiff for not calling a witness who was equally available to the other parties, since that witness was an employee of Old Dominion Stevedoring Corporation. We feel the law controlling our set of facts is pronounced in Illinois Central Railroad Co. v. Staples, supra. In that case the Court held:

> "Where witnesses are equally available to either of the parties, no adverse inferences may be drawn from the failure of one party to call them * * *"

■ If the defendant felt that the breaster, Bowden, would have refuted the plaintiff's testimony, then the defendant could have readily called Bowden. We hold that no inference exists against the plaintiff for not calling a witness that the defendant had an equal opportunity to call.

■ The defendant contends that the conglomeration of the above-stated events casts doubt on the very happening of the Brinkley accident of July 31, 1968. After weighing all of the evidence and circumstantial happenings, we hold that Brinkley did suffer the described accident.

The plaintiff contends that a proximate cause of the accident was the continuous jerking of the winches. The plaintiff's witnesses testified that from the time the cargo operation began, the winch operators were having trouble with the winches jerking and jumping; i. e., not starting at all when first engaged, and then suddenly starting at a high rate of speed as more power was applied and failing to stop promptly when the control was placed in neutral. This particular testimony of the winchman, Trance Hyman and Emanuel R. Robinson, and the gangwayman, John Custis, has little, if any, probative value however. These witnesses were under the impression that the winches on the SELFOSS were electric, when in fact they were hydraulic. On deposition, Hyman and Robinson spoke of a wheel control. The winch controls on the No. 4 hatch of the SELFOSS are lever controls. The gangwayman spoke of an engineer from the ship's crew removing some bolts and inspecting beneath a plate on Hyman's winch after receiving complaints of the jerking. Adin K. Woodward, a naval architect and marine surveyor, testified that an engineer would go to the engine room to inspect a complaint of trouble on hydraulic winches of the type in question. All of the controls, gauges, and thermometers that operate the hydraulic winch are located in the engine room, and not on deck. Woodward conducted an inspection of the winch and controls on the No. 4 hatch of the SELFOSS. He found nothing, or could conceive of nothing, such as a plate that could be taken off the winch to give ready access to repair work. There is a plate on the winch that is bolted on the casing. However, it is merely a label plate to indicate various speed positions, and would not expose any controls of the winch if it were removed. The de bene esse deposition of G. J. Geirsson, who was the chief engineer on the SELFOSS during the period in which Brinkley was injured, was admitted into evidence. Geirsson stated that all repairs of the winches would be done by him or under his supervision. He did not receive a complaint on July 31, 1968, concerning "jerking" or any other trouble with the winches. In fact, Geirsson testified that from May 1967 until the date of the deposition on February 23, 1971, there had never been any trouble with the winches of the SELFOSS.

Woodward testified in his capacity as an expert that the inherent attributes of the hydraulic winch system used

aboard the SELFOSS precluded the described "jerking" as a possible malfunction of the winch system. If anything malfunctioned in the system, then the system would stop. It is the opinion of this Court that any apparent "jerking" in the winch or the lines was not caused by any malfunction of the mechanisms of the winches on board the SELFOSS.

■ The plaintiff maintains that the cargo operation was conducted in a continued negligent manner that made the vessel unseaworthy under Venable v. A/S Det Forenede Dampskibsselskab, 399 F. 2d 347 (4 Cir., 1968). In the particular operation applicable to the instant case, the slingers stood midway between the rolls of linerboard. William Wheeler, a consultant in a marine survey firm, criticized this local practice. It was his opinion that the slingers should stand at the ends of the rolls rather than on the sides. The end positions would give the slingers more control. This position would also be safer in that it removes the slinger from the path of the draft in case it should inadvertently roll toward the men. However, the record does not substantiate that the critical lift was other than vertical. Assuming arguendo that the plaintiff has exposed a local practice which may not be the safest way to accomplish the loading procedure, it is the view of this Court that the local practice of having the slingers position themselves at the midpoint of the linerboard rolls, rather than at the end of the rolls, was not a factor in producing the injury to Brinkley. This procedure was not a proximate cause of the injury, nor do we accept Wheeler's testimony that such an operating procedure is necessarily unsafe.

It is the opinion of this Court that the proximate cause of the accident was the negligent act on the part of one of Brinkley's fellow longshoremen. As gangwayman at the No. 4 hold of the SELFOSS, Custis was charged with the duty of relaying the signal to hoist the load from one of the longshoremen working on the apron to the winch operators stationed at the controls. The winchmen are not able to observe the slingers on the pier from their positions at the winch controls. Thus, Custis served as the "eyes" of the winchmen. On the morning of the accident, the breaster, Richard Bowden, was giving the hoist signal to Custis. Bowden would fix one of the two ropes around the linerboard, step back into a position of safety, then give the hoist signal after seeing that Brinkley was also in a position of safety. We hold that one of these two fellow stevedores, Custis or Bowden, was negligent in giving or relaying the signal to the winchmen before seeing that Brinkley had a chance to clear himself of the cargo load. Consequently the winchman started to hoist the load before Brinkley could step back, and Brinkley was caught by the slings and hoisted into the air with the cargo load.

■ Did this single act of negligence on the part of Brinkley's fellow workers create a condition of unseaworthiness? It is not necessary for the injured plaintiff, who bases his claim of injuries on unseaworthiness, to prove negligence on the part of the shipowner. The shipowner's duty to provide a seaworthy ship has been defined by the Supreme Court of the United States as absolute, nondelegable, and completely independent of the duty to exercise reasonable care. Waldron v. Moore-McCormack Lines, Inc., 386 U.S. 724, 87 S.Ct. 1410, 18 L.Ed. 2d 482 (1967); Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960); Crumady v. The J. H. Fisser, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413 (1959). In Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946), the Court, in extending this duty to longshoremen working as seamen, as well as to crew members, held that a shipowner's liability is "essentially a species of liability without fault, analogous to other well known instances in our law. * * * It is a form of absolute duty owing to all within the range of its humanitarian policy." 328 U.S. at 94–95, 66 S.Ct. at 877. These cases left open the subsidiary but not unimportant questions both as to exactly

what was "within the range" and as to how far the duty extended. Gilmore and Black, The Law of Admiralty, pp. 324–325 (1957), intimates that *Sieracki,* supra, could extend to a stevedore's injury caused by the negligence on the part of one of his fellow stevedores by Alaska S. S. Co., Inc. v. Petterson, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798 (1954), rehearing denied 347 U.S. 994, 74 S.Ct. 848, 98 L.Ed. 1127 (1954). That question has been recently answered by the Supreme Court in Usner v. Luckenbach Overseas Corp., 400 U.S. 494, 91 S.Ct. 514, 27 L.Ed.2d 562 (1971).[1] In *Usner* the petitioner, a longshoreman employed by an independent stevedoring contractor, was injured while engaged with his fellow employees in loading cargo aboard a ship. The petitioner's job was to secure bundles of cargo to a sling attached to the fall each time it was lowered from the ship's boom onto the barge by the winch operator. On one occasion the winch operator did not lower the fall far enough. The petitioner motioned to the flagman on the deck of the ship to direct the winch operator to lower the fall farther. The fall was lowered too far and too fast, thus striking the petitioner and causing his injuries. In a concise majority opinion, the Court enumerates some well-known admiralty doctrines. Liability based on unseaworthiness is wholly distinct from liability based upon negligence, since unseaworthiness is a condition, and how that condition came into being, whether by negligence or otherwise, is irrelevant from the owner's liability for personal injuries resulting from it. The Court then held:

> "What caused the petitioner's injuries in the present case, however, was not the condition of the ship, her appurtenances, her cargo or her crew, but the isolated, personal negligent act of the petitioner's fellow longshoreman. To hold that this individual act of

negligence rendered the ship unseaworthy would be to subvert the fundamental distinction between unseaworthiness and negligence that we have so painstakingly and repeatedly emphasized in our decisions. * * * (I)t would be * * * erroneous here, where no condition of unseaworthiness existed, to hold the shipowner liable for a third party's single and wholly unforeseeable act of negligence." Usner v. Luckenbach Overseas Corp., supra, at p. 500, 91 S.Ct. at p. 518.

■■ James Brinkley's accident fits directly within the *Usner* doctrine. Brinkley was employed by an independent stevedoring contractor as was Usner. Brinkley was injured while engaged with his fellow employees in loading cargo aboard a ship as was the situation in *Usner.* However, most importantly, what caused Brinkley's injuries was not the condition of the ship or the winches. Brinkley was injured solely by a personal negligent act of one of his fellow longshoremen as was Usner. Under the *Usner* doctrine, a single act of negligence does not make the ship unseaworthy. Therefore it is the holding of this Court that the plaintiff, James W. Brinkley, is denied any recovery against defendant, H/f Eimskipafelag Islands, for injuries he suffered because of an act of negligence on the part of his fellow stevedore, and said defendant was guilty of no negligence. As far as the rights of H/f Eimskipafelag Islands, defendant and third-party plaintiff, against Old Dominion Stevedoring Corporation, the third-party defendant, are concerned, this matter is reserved for further ruling. As to this latter point, in light of the Court's findings and conclusion, we believe it obvious that the third-party plaintiff would be entitled to recover reasonable expenses and attorneys' fees, in the absence of some contractual arrangement to the contrary.

1. Usner cites Venable v. A/S Det Forenede Dampskibsselskab, 399 F.2d 347 (4 Cir., 1968), as apparently taking a contrary view. We must assume that Venable has been modified accordingly or, in part at least, reversed.