**HELLENIC LINES LIMITED and Universal Cargo Carriers, Inc., Appellants,**

v.

**Zacharias RHODITIS, Appellee.**

**No. 25699.**

United States Court of Appeals Fifth Circuit.

May 8, 1969.

Rehearing Denied and Rehearing En Banc Denied July 3, 1969.

George F. Wood, Pillans, Reams, Tappan, Wood & Roberts, Mobile, Ala., for appellants.

Joseph B. Stahl, New Orleans, La., Ross Diamond, Jr., Diamond, Lattof & Favre, Mobile, Ala., for appellee.

Before GOLDBERG and AINSWORTH, Circuit Judges, and SPEARS, District Judge.

GOLDBERG, Circuit Judge:

Sixteen years after Lauritzen v. Larsen[1] we must fish in somewhat turgid waters for its spawn in order to determine the applicability of the Jones Act.[2] The question presented is whether or not the Jones Act applies so as to allow recovery to a Greek seaman who was injured in a United States port on a Greek-flag vessel owned and controlled by United States domiciliaries. We hold that the Jones Act applies and affirm the judgment of the district court.[3]

Zacharias Rhoditis, an illiterate Greek seaman, was injured aboard the S. S. HELLENIC HERO while the ship was docking at the Port of New Orleans. Seeking compensation for his injury, Zacharias brought suit under the Jones Act against the appellants, Universal Cargo Carriers, Inc., and Hellenic Lines, Ltd.[4]

1. 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953).

2. 46 U.S.C.A. 688 (1958), the Jones Act, provides as follows:
"Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply; and in case of the death of any seaman as a result of any such personal injury the personal representative of such seaman may maintain an action for damages at law with the right of trial by jury, and in such action all statutes of the United States conferring or regulating the right of action for death in the case of railway employees shall be applicable. Jurisdiction in such actions shall be under the court of the district in which the defendant employer resides or in which his principal office is located. * * *"

3. The district court's opinion is reported at 273 F.Supp. 248.

4. This suit originated as a libel under the general admiralty laws of the United States, *in rem* against the HELLENIC HERO and *in personam* against Universal Cargo Carriers and Hellenic Lines. After discovering that the appellants had substantial United States ties, Zacharias successfully moved to have the Jones Act applied. The suit under the Jones

The HELLENIC HERO, which flies the Greek ensign and is registered in the port of Piraeus, Greece, has multi-nation ties, but its ownership is essentially American. Technically, the ship is owned by a Panamanian corporation which in turn is owned by a Greek corporation. However, ninety-five per cent of the stock of the Greek corporation is owned by two residents of the United States, and the corporation has its principal office in New York. Universal Cargo Carriers, the Panamanian corporation, is solely a holding company with no operational responsibilities in connection with the HERO. The real ownership and operational responsibilities are vested in Hellenic Lines, a corporation organized and existing under the laws of Greece. Hellenic is managed from a base in New York,[5] and is owned almost entirely by Pericles Callimanopoulos and his son.

Pericles, although a Greek citizen, has resided in the United States since 1945. With a home in Greenwich, Connecticut, and an office in New York City, Pericles performed his duties as managing director of the corporation from the United States. Under Pericles' direction, the HERO engaged in regularly scheduled runs between various gulf ports of the United States and ports in the Middle East. The entire income of the HERO was from cargo either originating or terminating in United States ports.

Zacharias signed on the HERO in Heraclion, Greece. His contract of employment provides that Greek law and the Greek Collective Bargaining Agreement shall apply as between the employer and the crew, and that all claims arising out of the contract of employment shall be adjudicated exclusively by the Greek courts.

In the court below Universal and Hellenic directed their defense so that it was primarily a challenge to the court's jurisdiction over the subject matter. The district court held that it had jurisdiction and explained its result as follows:

"Following the law announced in Lauritzen vs. Larsen, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254, it would seem to us that the contacts in this case with this country are quite substantial. The Libelant was injured in the Port of New Orleans, Louisiana, aboard a vessel regularly engaged in a scheduled trade to and from the United States Gulf ports; the vessel and its controlling corporations are owned by a resident of the United States, having enjoyed his residence in this country in excess of twenty (20) years, and the operation was clearly managed, controlled and operated from this country. Under these facts, I hold that this Court has jurisdiction and that the Jones Act is applicable. [cases cited]." 273 F.Supp. at 249–250.

The court then found that Zacharias' injury was the proximate result of the appellants' negligence and awarded damages in the amount of $6,000.

The sole issue raised by this appeal is whether the facts at bar warrant the application of the Jones Act, which is the basis of the district court's assertion of jurisdiction. Both parties rely on the primogenial case of Lauritzen v. Larsen, 1953, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254, for what it says and for what it does not say. In *Lauritzen* the question was whether one Larsen, a Danish seaman negligently injured on board a ship of the Danish flag in Havana harbor, had a cause of action under the Jones Act. Larsen, while temporarily in New York, had joined the crew of this ship owned by a Danish citizen. He had signed ship's articles providing that the rights of crew members would be governed by Danish law and by the employer's contract with the Danish Seamen's Union. In holding that the Jones Act did

---

Act "is *in personam* against the ship's owner and not one *in rem* against the ship itself." Lauritzen v. Larsen, *supra*, 345 U.S. at 574, 73 S.Ct. at 924, 97 L.Ed. at 1263.

5. The record reflects that the New York office of Hellenic Lines has seventy-five employees. Another corporate office, which is located in New Orleans, employs fifteen.

not apply, the Supreme Court listed seven factors to be considered in answering the question of applicability: (1) the place of the wrongful act; (2) the law of the flag; (3) the allegiance or domicile of the injured seaman; (4) allegiance of the defendant shipowner; (5) the place where the contract of employment was made; (6) the inaccessibility of a foreign forum; and (7) the law of the forum.

If we were to weigh the seven immortal pillars of *Lauritzen* by merely counting contacts, the score would be three for Jones Act coverage, four against.[6] The immortal seven, however, are not to be so mechanistically applied.

*Lauritzen* did not create a contact counting test.

Rather the Supreme Court intended the applicability question to be answered by "ascertaining and valuing points of contact between the transaction and the states or governments whose competing laws are involved," and "from weighing of the significance of one or more connecting factors between the shipping transaction regulated and the national interest served by the assertion of authority." 345 U.S. at 582, 73 S.Ct. at 928, 97 L.Ed. at 1267. "Hence it must be said that in a particular case something between minimal and preponderant contacts is necessary if the Jones Act is to

---

6. The factors here pointing to Jones Act applicability are: (1) the seaman was injured in a United States port; (2) the defendant shipowner is a United States domiciliary and operates his shipping business from this country; and (3) the forum is a United States court. The contacts pointing the other way are: (1) the ship's flag is Greek; (2) the injured seaman is Greek; (3) the seaman's contract of employment was made in Greece; and (4) there is a foreign forum available to the injured seaman.

Zacharias, however, contends that the count should be the other way: four to three in favor of coverage. He argues that there is no foreign forum accessible to him because a Greek court could not exercise jurisdiction of his suit, notwithstanding the appellants' willingness to submit to Greek jurisdiction. In support of this contention the appellee cites Bikos v. Miralago Compania Armadora, S.A., a 1962 case in which the Athens Court of Appeals refused to exercise jurisdiction in a case similar to the one *sub judice.* According to the appellee's brief, the *Bikos* case involved a tort claim by a Greek citizen against a Panamanian corporation which owned the Greek flag vessel on which the Greek plaintiff was injured. In holding that it was without jurisdiction over the controversy, the Athens court said:

"Foreigners come indeed under the jurisdiction of this country's courts, according to Article 126 of the Introductory Law to the Civil Code; they can sue or be sued in accordance with provisions in effect relating to jurisdiction, if such jurisdiction is among the general and specific jurisdictions mentioned in the Civil Procedure. But

such jurisdiction of the Piraeus Court of First Instance or other domestic court or judge does not apply to the appellee foreign corporation, since * * appellant's services to it, during the rendering of which he was injured, were rendered abroad."

In the court below the appellee did not introduce the Bikos opinion into evidence and made no effort to prove that it represented the law of Greece. Since it was not proved as a fact, we cannot take judicial notice of its holding. Rowan v. Commissioner of Internal Revenue, 5 Cir. 1941, 120 F.2d 515, 516; In re Mylonas, N.D.Ala.1960, 187 F.Supp. 716, 721; 5 Moore's Federal Practice § 43.09 (1968); 9 Wigmore on Evidence § 2573 (1940). In Black Diamond S. S. Corp. v. Robert Stewart & Sons, 1949, 336 U.S. 386, 397–398, 69 S.Ct. 622, 628, 93 L.Ed. 754, 764, the Supreme Court instructs us:

"Since Belgian law may be enforceable by our courts, that law, having been pleaded, must be established. It is true that this Court has on several occasions held international rules which had passed into the 'general maritime law' to be subject to judicial notice. [cases cited]. But where less widely recognized rules of foreign maritime law have been involved, the Court has adhered to the general principle that foreign law is to be proved as a fact. [cases cited]."

Moreover, there is uncontradicted testimony in the record to the effect that Zacharias could obtain relief through the Greek courts if he sought it. Upon this record, therefore, we cannot say that the appellee lacks access to a foreign forum.

be applied. * * * [T]he test is that 'substantial' contacts are necessary. And while * * * one contact such as the fact that the vessel flies the American flag may alone be sufficient, this is no more than to say that in such a case the contact is so obviously substantial as to render unnecessary a further probing into the facts." Bartholomew v. Universe Tankships, Inc., 2 Cir. 1959, 263 F. 2d 437, 440, cert. denied, 359 U.S. 1000, 79 S.Ct. 1138, 3 L.Ed.2d 1030. Likewise, the seven talismen are neither exclusive nor immutable.[7]

■■ The Supreme Court clearly indicated that the immortal seven were not to be given equal weight and that their significance might vary from case to case. The Supreme Court ascribed little significance to the place of contract, to the inaccessibility of a foreign forum, and to the law of the forum. We shall do likewise. Moreover, in this case we find the domicile of the injured seaman to be unimportant. The factor said to be of "cardinal importance" is the law of the flag. "[T]he weight given to the ensign overbears most other connecting events in determining applicable law," and "it must prevail *unless some heavy counterweight appears.*" [emphasis added]. 345 U.S. at 584–586, 73 S.Ct. at 930, 97 L.Ed. at 1269. In this case we find that heavy counterweight: the HELLENIC HERO was for all commercial purposes owned and operated by a United States domiciliary.[8]

The HERO's flag is more symbolic than real as is evidenced by the fact that its operation and ownership ties are American, not Greek. Under these circumstances it is fair to say that the HERO's flag is not due the same weight which *Lauritzen* gave to a more sturdy flag. Courts need not elevate symbols over reality. We therefore pierce the corporate veil and conclude that the HERO's flag is merely one of convenience.

*Lauritzen* itself recognized that courts are not bound by flags of convenience:

"[I]t is common knowledge that in recent years a practice has grown, particularly among American shipowners, to avoid stringent shipping laws by seeking foreign registration eagerly offered by some countries. Confronted with such operations, our courts on occasion have pressed beyond the formalities of more or less nominal foreign registration to enforce against American shipowners the obligations which our law places upon them." 345 U.S. at 587, 73 S.Ct. at 931, 97 L.Ed. at 1270.

7. In Pavlou v. Ocean Traders Marine Corp., S.D.N.Y.1962, 211 F.Supp. 320, 325, the court found an eighth contact worthy of consideration—the shipowner's base of operations:

"This court recognizes that the factor of base of operations was not emphasized by the Supreme Court in Lauritzen v. Larsen, 348 U.S. 571, 73 S.Ct. 921, 97 L.Ed 1254 (1953). However, the court does not interpret that decision as an attempt by the Supreme Court to exhaust the factors which may be relevant. It is clear that there the court was only dealing with the circumstances which were present therein. Indeed, in the Bartholomew case, supra, at page 443 of 263 F.2d, the Court of Appeals of this Circuit interpreted the Lauritzen decision in this way. Further, persuasive authority exists to support the view that the base of operations of the persons directing the operations of the vessel is a factor making the Jones Act applicable."
We agree with *Pavlon* that courts should consider the location of the shipowner's base of operation in conjunction with the seven factors articulated in *Lauritzen*. Since New York was the principal office of Hellenic Lines, this factor points persuasively toward Jones Act applicability.

8. Since he has resided in the United States and maintains both his home and principal place of business here, Pericles is properly categorized as a domiciliary of this country. See Mitchell v. United States, 1875, 88 U.S. (21 Wall.) 310, 22 L.Ed. 584, 586. See also 28 C.J.S. Domicile § 11(f) ("A change of domicile to another country does not involve or require a change of nationality or an intent to cast off all allegiance to the country of the former domicile.")

Our course through the corporate veil also has strong support in post *Lauritzen* cases:

"Although appellant contends otherwise, the practice in this type of case of looking through the façade of foreign registration and incorporation to the American ownership behind it is now well established. [cases cited]. This is essential unless the purposes of the Jones Act are to be frustrated by American shipowners intent upon evading their obligations under the law by the simple expedient of incorporating in a foreign country and registering their vessels under a foreign flag. See Lauritzen, 345 U.S. at 587, 73 S.Ct. at 930 [97 L.Ed. at 1270]. In the case now before us appellant has taken the trouble to insert an additional nominal foreign corporation between the flag and the true beneficial ownership of the vessel. But we have little difficulty in brushing all this aside when considering the applicability *vel non* of the Jones Act. Complicating the mechanics of evasive schemes cannot serve to make them more effective. What we now do is not to disregard the corporate entity to impose liability on the stockholders, but rather to consider a foreign corporation as if it were an American corporation pursuant to the liberal policies of a regulatory act. [cases cited]." Bartholomew v. Universe Tankships, supra, 263 F.2d at 442.

See also Southern Cross Steamship Co. v. Firipis, 4 Cir. 1960, 285 F.2d 651, 84 A. L.R.2d 895, cert. denied, 365 U.S. 869, 81 S.Ct. 903, 5 L.Ed.2d 859; Pavlou v. Ocean Traders Marine Corp., S.D.N.Y. 1962, 211 F.Supp. 320; Voyiatzis v. National Shipping & Trading Corp., S.D. N.Y.1961, 199 F.Supp. 920; Zielinski v. Empresa Hondurena de Vapores, S.D.N. Y.1953, 113 F.Supp. 93.

■ Most of the flag of convenience cases have involved ships whose owners were American citizens, not aliens domiciled in the United States as here. This distinction should make no difference because aliens residing in this country are, with rare exception, subject to the same commercial and tort laws as United States citizens. In Leonhard v. Eley, 10 Cir. 1945, 151 F.2d 409, 410, wherein *a resident alien was held to be subject* to our Selective Service laws, we read of the obligations owed by aliens residing on our shores:

"Aliens residing in the United States so long as they are permitted by the government to remain therein, are entitled generally, with respect to the rights of person and property and to their civil and criminal responsibility, to the safeguards of the Constitution and to the protection of our laws. However, they may exercise only such political rights as are conferred upon them by law. Their duties and obligations, so long as they reside in the United States, do not differ materially from those of native-born or naturalized citizens. Equally with such citizens, for the rights and privileges they enjoy, they owe allegiance to our country, obedience to our laws, except those immediately relating to citizenship, contribution to the support of our governments, state and national; and in war, they share equally with our citizens the calamities which befall our country; and their services may be required for its defense and their lives may be periled for maintaining its rights and vindicating its honor."

The financial responsibility for compensating injured seamen is much less onerous than the personal sacrifice an alien makes when he serves in our military. This being true, it follows that a corporation owned by resident aliens should be subject to the Jones Act just as much as a corporation owned by United States citizens. Hellenic Lines and Universal Cargo Carriers are commercially domiciled in this country and therefore owe fealty to our laws.

The American character of this tort is further emphasized by the fact that Zacharias' injury occurred in the Port of New Orleans. This alone would not be sufficient to invoke the Jones Act.

Romero v. International Terminal Operating Co., 1959, 358 U.S. 354, 381–384, 79 S.Ct. 468, 3 L.Ed.2d 368, 387–389. It is, however, a countervailing factor which weakens our bondage to the flag. When combined with the totality of American contacts, the fact that the accident occurred in our territorial waters points to Jones Act applicability. In Southern Cross Steamship Co. v. Firipis, *supra*, 285 F.2d at 655, we read:

> "[T]he effective control of the vessel was by American interests. This, coupled with the fact that the injury occurred while the ship was in drydock in an American port and with the ship's Hondurian registration being illusory, is sufficient under the doctrine of Lauritzen v. Larsen, supra, for the application of the Jones Act."

We recognize that the Second Circuit has reached a contrary result on identical facts (the defendants there were, as here, corporations dominated by Pericles and the plaintiff was a Greek seaman injured in a United States port). Tsakonites v. Transpacific Carriers Corp., 2 Cir., 1966, 368 F.2d 426, cert. denied, 386 U.S. 1007, 87 S.Ct. 1348, 18 L.Ed.2d 434. The appellee attempts to distinguish *Tsakonites* on the tenuous ground that at the time of Tsakonites' accident Pericles had not met the residence requirements for United States citizenship, whereas in our case Pericles had fulfilled that eligibility requirement at the time of Zacharias' injury. Casting such finite distinctions aside, we find that we cannot accept the reasoning and conclusion of the *Tsakonites*' majority. Instead we find our haven in the persuasive logic of Judge Waterman's dissent from which we shall quote *in extenso*:

> "United States courts have pierced through the facade of foreign registration and foreign incorporation and have applied United States law, including 46 U.S.C. § 688 application, when American-based shipowners who are United States citizens have sought the protection from seamen's suits of less onerous laws of foreign states and have registered their vessels elsewhere than

here. [cases cited]. I would hold that here, in this case, where the injury occurred at dockside in the United States, United States law should be applied when the defendant shipowner, though an alien, has continued to register his vessels abroad while he currently enjoys the considerable benefits of permanent resident alien status here, a status deliberately sought by him. I cannot follow the argument that, in this respect, the application of United States law to this event that occurred in our territorial waters should depend upon whether the vessel upon which the event occurred is owned by a United States citizen or is owned by a United States resident alien. We accord a lawful permanent resident alien the same constitutional protections we accord a citizen of the United States. See Kwong Hai Chew v. Colding, 344 U.S. 590, 596, 73 S.Ct. 472, 97 L.Ed. 576 (1953). Moreover, the duties and obligations of a resident alien have not been thought to 'differ materially from those of native-born or naturalized citizens.' Leonhard v. Eley, 151 F.2d 409, 410 (10 Cir. 1945). To be sure, a resident alien in some respects does not have legal parity with a United States citizen; for example, the Constitution requires that only citizens may be candidates for election to the House of Representatives and to the Senate; and an alien may be sued in any U. S. Judicial district. Nevertheless, established authority, see, e. g., Leonhard v. Eley, supra, suggests that any United States law, such as the Jones Act, that imposes duties and obligations upon persons, should be evenly applied to United States citizens and resident aliens.

> "So unless the same obligations that United States law imposes on shipowners who are United States citizens are imposed on resident alien shipowners, a resident alien shipowner like Callimanopoulos will be able to enjoy the considerable benefits of lawful permanent resident alien status in this country without being subject to the

duties and obligations exacted of an otherwise similarly situated competitive shipowner who is an American shipowner. The statement of this last proposition would seem to be enough to require a reversal instead of an affirmance of the order below. Moreover, under these circumstances, I do not regard as significant the fact that when this Greek seaman signed on he agreed to limit his rights to those arising under Greek law. Surely we would not consider such to be decisive, or even important, if the shipowner behind the Greek-incorporated corporation was a United States citizen inasmuch as the accident occurred while the vessel was berthed at a New York harbor pier.

"I repeat: Shipowners who are resident aliens and shipowners who are United States citizens should be subject to the same liabilities for injuries suffered by their employees on their vessels when the vessels are at United States piers. If a United States shipowner is liable under the Jones Act to a foreign seaman serving on a foreign-registered vessel injured in our territorial waters, a permanently resident alien should also be so liable." 368 F.2d at 429–430.

We hold that the district court correctly found that it had jurisdiction to apply the Jones Act. The power of the flag is not limitless, and its cloth should not be stretched beyond realistic and reasonable lengths. Maritime allegiance is not to be defined in a patriotic, nationalistic, or chauvinistic sense, but in terms of economic ties. The HERO and its owners were not strangers wandering to our shores. Not only did most of the HERO's nautical peregrinations call for United States docking, but its ownership also rested here. The alienage of Pericles and his corporate entourage is clearly much less factual than fictional. We respect the inviolability of Pericles' choice of sovereignty, but not his choice of law.

Affirmed.

ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

PER CURIAM:

The Petition for Rehearing is denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is denied.