George **KARVELIS**, Plaintiff,

v.

**CONSTELLATION LINES SA; Entemar Shipping Co. SA; Constellation Lines, Inc.; and Constellation Navigation, Inc.; as agent for Entemar Shipping Co. SA, Constellation Lines SA and Constellation Lines, Inc., Defendants.**

No. 84 Civ. 2609 (RLC).

United States District Court,
S.D. New York.

April 12, 1985.

---

**18.** *Cf.* 14 C.F.R. § 91.79 (1984).

Meyers, Tersigni, Kaufman, Lurie, Feldman & Gray, Friedman and Eisenstein, New York City, for plaintiff; Harvey J. Kaufman, Paul K. Feldman, New York City, of counsel.

Alexander, Asch, Schwartz & Cohen, P.C., New York City, for defendants; Joseph Arthur Cohen, Christopher P. Di Giulio, New York City, of counsel.

## OPINION

ROBERT L. CARTER, District Judge.

George Karvelis, a Greek seaman, was injured on March 24, 1984, while working aboard the Greek flagship Constellation Enterprise ("Enterprise") in port at Newark, New Jersey. His left hand became caught in the machinery that elevates and lowers the auto deck, and four of his fingers were severed.

Karvelis brought suit under the Jones Act, 46 U.S.C. § 688, and general maritime law against the Enterprise's owner, Entemar Shipping Co. SA ("Entemar"), its charterer, Constellation Lines SA ("Lines"), and against Entemar's and Lines' New York agent, Constellation Navigation, Inc. ("Navigation").[1]

Entemar and Lines are Panamanian corporations, with their principal places of business in Greece. Both corporations are completely owned by Spilios A. Sofianopoulos, Nicolaos A. Spyrakos, and Dionyssios G. Vlachos, citizens and residents of Greece. Navigation is a New York corporation. Neither Sofianopoulos, Spyrakos nor Vlachos owns stock in Navigation.

---

1. Karvelis also named as a defendant Constellation Lines, Inc. It is unclear who or what that entity is. Karvelis asserts in his complaint that it is a New York corporation and that it and Constellation Lines SA "constitute the shipping lines of which the vessel CONSTELLATION ENTERPRISE is a part." Defendants Entemar, Lines and Navigation do not address this assertion in their answer. Counsel representing Entemar, Lines and Navigation does not purport to represent Constellation Lines, Inc., and Constellation Lines, Inc. is not represented by separate counsel. No further mention of Constellation Lines, Inc. is made in the parties' papers.

Defendants have moved to dismiss the complaint against Entemar and Lines for lack of subject matter jurisdiction, or, in the alternative, on grounds of *forum non conveniens*. No motion has been made concerning the action against defendant Navigation.

## DISCUSSION

Defendants argue that Greek law governs this case, and therefore that the court cannot assert subject matter jurisdiction [2] over the case [3] under the Jones Act. To determine whether the Jones Act governs, the court must apply the test established by the Supreme Court in *Lauritzen v. Larsen*, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953) and *Hellenic Lines Ltd. v. Rhoditis*, 398 U.S. 306, 90 S.Ct. 1731, 26 L.Ed.2d 252, *reh. denied*, 400 U.S. 856, 91 S.Ct. 23, 27 L.Ed.2d 94 (1970). In *Lauritzen, supra*, 345 U.S. at 582–92, 73 S.Ct. at 928–33, the Court ruled that the Jones Act comes into play where there are substantial contacts between the event in question and the United States. The Court laid out seven determinative factors for courts to consider: (1) the place of the wrongful act; (2) the law of the flag; (3) the allegiance or domicile of the injured plaintiff; (4) the allegiance of the defendant shipowner; (5) the place where the contract of employment was made; (6) the accessibility of a foreign forum; and (7) the law of the forum.

In *Hellenic Lines, supra*, 398 U.S. at 308–09, 90 S.Ct. at 1733–34, the Court added to these seven factors the "base of operations of the shipowner." Noting that the *Lauritzen* test was not a mechanical one, the Court emphasized that each factor must be weighed in light of the national interest that would be served by the application of the Jones Act. If a ship is more than "a casual visitor" to the United States and the shipowner is "engaged in an extensive business operation in this country," then the Jones Act should apply (even if most other factors point toward application of foreign law); otherwise, the Court reasoned, foreign shipowners operating in American waters would be allowed to escape the obligations of a Jones Act employer, and would be granted an unfair competitive advantage over their American counterparts. *Id.* at 309–10, 90 S.Ct. at 1734–35.

Most of the *Lauritzen* factors in this case point to application of Greek law. The plaintiff, defendants, and vessel are Greek.

---

**2.** It is unclear whether this motion should be treated as one for lack of subject matter jurisdiction or for failure to state a claim. On the one hand, in *Lauritzen v. Larsen*, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953) and in *Romero v. International Terminal Operating Co.*, 358 U.S. 354, 79 S.Ct. 468, 3 L.Ed.2d 368, *reh. denied*, 359 U.S. 962, 79 S.Ct. 795, 3 L.Ed.2d 769 (1959), the Supreme Court treated similar motions as ones for failure to state a claim. Quoting from *Montana-Dakota Utilities Co. v. Northwestern Public Service Co.*, 341 U.S. 246, 249, 71 S.Ct. 692, 694, 95 L.Ed. 912 (1951), the *Romero* court noted, "As frequently happens where jurisdiction depends on subject matter, the question whether jurisdiction exists has been confused with the question whether the complaint states a cause of action." *Romero, supra*, 358 U.S. at 359, 79 S.Ct. at 473. In *Lauritzen* and *Romero,* as in the instant case, the plaintiff asserted a substantial claim that the Jones Act afforded him a right of recovery for his employer's negligence. "Such assertion alone is sufficient to empower the District Court to assume jurisdiction over the case and determine whether, in fact, the Act does provide the claimed

rights." *Id.* On the other hand, in *Hellenic Lines Ltd. v. Rhoditis*, 398 U.S. 306, 90 S.Ct. 1731, 26 L.Ed.2d 252, *reh. denied*, 400 U.S. 856, 91 S.Ct. 23, 27 L.Ed.2d 94 (1970), the Court explicitly treated the same sort of motion as a motion for lack of subject matter jurisdiction. It is not apparent whether the Court's language in *Hellenic Lines* was intended to overrule *Lauritzen* and *Romero,* or was merely an unguarded and passing dictum. *See Rodriguez v. Flota Mercante Grancolombiana, S.A.*, 703 F.2d 1069 (9th Cir.), *cert. denied*, —— U.S. ——, 104 S.Ct. 84, 78 L.Ed.2d 94 (1983). The court need not decide the issue, since its approach would be similar in either case.

**3.** The complaint in this case alleges three claims for relief, the first under the Jones Act and the latter two under general maritime law. Plaintiff claims this court has jurisdiction only under the Jones Act, and not under general maritime law. I agree that the court does not have jurisdiction to adjudicate general maritime law claims brought by a foreign plaintiff against foreign defendants. *Romero v. International Terminal Operating Co., supra* n. 2.

Plaintiff's articles of employment are Greek, and call for the resolution of all disputes arising out of his employment in Greek courts.[4] Karvelis has access to a Greek forum. The only *Lauritzen* factors favoring United States law are the place of the accident (New Jersey) and the law of the forum. These are not weighty factors. *E.g. Pandazopoulos v. Universal Cruise Line, Inc.*, 365 F.Supp. 208 (S.D.N.Y.1973) (Cannella, J.).

Plaintiff contends that the Jones Act should apply nevertheless because the defendant-shipowner has a "base of operations" in New York. *See Moncada v. Lemuria Shipping Corp.*, 491 F.2d 470, 472 (2d Cir.), *cert. denied sub nom. Ekberg Shipping Corp. v. Moncada*, 417 U.S. 947, 94 S.Ct. 3072, 41 L.Ed.2d 667 (1974) ("substantiality [of contacts is] to be determined on an absolute scale and not by comparing or balancing the presence of certain contacts with the absence of others"). The evidence submitted to the court shows that, to a significant extent, the Enterprise is managed from New York. In an agreement dated May 5, 1978, Lines, in Greece, delegated to Navigation, in New York, authority to be Lines' "general agents to perform all of the customary services of a traffic representative ..." (Plaintiff's exh. 6 ¶ 1). As such, Navigation solicited cargo for the Enterprise—nearly 70 percent of the cargo bound for the Mediterranean and 50 percent of the cargo bound for the United States was booked by Navigation. (Christophides[5] aff. ¶ 10). Navigation collected Lines' revenues, and deposited them in two "multi-million" dollar accounts in New York banks in Lines' name. (Christophides dep. at 71). Navigation had the authority to withdraw from these accounts to pay the Enterprise's expenses. Navigation also arranged for stevedoring, fuel, and tugboats for the vessel, and handled berthing and traffic matters. Navigation advertised in the Journal of Commerce as the general agent for Constellation Line.[6] These activities were all handled from New York, without the direction, supervision, or control of the owners and charterers in Greece. (Christophides aff. ¶ 7).

The Enterprise was hardly a "casual visitor" to the United States. For the fifteen months preceding Karvelis' injury, the Enterprise was engaged in regular transatlantic trade, carrying food items from Mediterranean ports to the Atlantic seaboard and returning to the Mediterranean with American-made tractors, military hardware, and other heavy machinery. (Christophides dep. at 35–36). The ship's itinerary shows that all nine voyages in those fifteen months connected United States ports—chiefly New York, Charleston, S.C., and Baltimore, Md.—with ports in the Mediterranean. (Plaintiff's exh. 3). Aside from the time the Enterprise was at sea, it was more often to be found in an American port than in the port of any other country. (*Id.*).

The Enterprise earned substantial income from cargo originating in or bound for the United States. This is an important consideration in determining whether the foreign defendants should be deemed to be in competition with American shippers. *Hellenic Lines, supra,* 398 U.S. at 310, 90 S.Ct. at 1734. Annually, the vessel earned approximately $7 to $8.5 million on cargo shipped from the United States to the Mediterranean, and $1.5 to $2.5 million[7] on car-

---

4. That Karvelis' contract calls for the resolution in Greece of all disputes arising out of his employment does not compel this court to deny plaintiff access to a United States forum. *See Hellenic Lines v. Rhoditis, supra* n. 2, and *Antypas v. Compania Maritima San Basilio, S.A.,* 541 F.2d 307 (2d Cir.1976), *cert. denied,* 429 U.S. 1098, 97 S.Ct. 1116, 51 L.Ed.2d 545 (1977) (cases adjudicated in United States forum despite similar contract provisions).

5. Orestes G. Christophides is the director of Navigation.

6. Constellation Line is the name Lines uses, as per agreement with Navigation, to designate its transatlantic shipping line. (Plaintiff's exh. 6 ¶ 19).

7. The transcript of Christophides' testimony regarding revenue from United States-bound cargo is a bit confused, owing to what are apparently typographical errors. It reads: "A million and a half, 20 million. It could be as much as 2½ of its capacity." The court reads this as "A million and a half, 2 million. It could be as much as 2½ if its [at] capacity." This reading

go shipped the other way. (Christophides dep. at 37–38). According to plaintiff, this constituted 100 percent of the Enterprise's revenues.[8] The Enterprise was thus more than just a periodic visitor to the United States; it was in direct competition with American shippers in an American market. And in addition to the Enterprise, Lines and Entemar ran three other ships on their Constellation Line, linking the United States with the Mediterranean. (Karvelis aff. ¶ 14).

Moreover, Sofianapoulos, Vlachos and Spyrakos have some direct involvement in the management of business ventures from American shores. During 1983 and 1984, Spyrakos and Vlachos would come to the United States twice annually on business, and would work out of Navigation's New York offices. (Christophides dep. at 83–85). Sofianapoulos would come to this country, too, about once a year. (Id.). In addition, the three men own part of two shipping-related corporations in the United States. Pursuant to an agreement with Navigation, Sofianapoulos, Vlachos and Spyrakos could designate an entity to own 50 percent of three South Carolina corporations located in Charleston, S.C.—Wando Stevedoring Co., Inc., Trident Shipping Agency, and Romney Realty. Akti[9] Shipping and Investment SA, a Panamanian corporation, was named. (Under the agreement, Navigation owned the other 50 percent of the South Carolina corporations). Though the precise extent of Sofianapoulos', Vlachos', and Spyrakos' ownership interest in Akti is not clear, defendants have conceded that the three are shareholders. (Defendants' brief at 8). Moreover, it is undisputed that Spyrakos is a director of Wando and Trident (though defendants claim that Spyrakos is not deeply involved, and is a director in name only). Trident is Navigation's Charleston sub-agent, and Wando performs stevedoring services for Lines' vessels, including the Enterprise. (Christophides dep. at 89–91). Trident and Wando rent their office space from Romney Realty. (Christophides dep. at 95–97).

Defendants argue that the Jones Act should not apply because "there exists no common identity between the Greek owners of the vessel involved herein and its agents in this country." (Defendants' brief at 7). They note that Sofianapoulos, Vlachos and Spyrakos own no shares of Navigation, and they point out that in *Antypas v. Compania Maritima San Basilio, S.A.,* 541 F.2d 307 (2d Cir.1976), *cert. denied,* 429 U.S. 1098, 97 S.Ct. 1116, 51 L.Ed.2d 545 (1977), the Second Circuit held the Jones Act applicable only after finding that the principal shareholders of the foreign shipowner corporation also owned stock in the ship's New York agent.

Defendants also cite *Volyrakis v. M/V Isabelle,* 668 F.2d 863 (5th Cir.1982), for the proposition that the existence of an American agent who is not the "alter ego" of the foreign shipowner is insufficient to justify application of American law.

█ It is true that the argument for application of the Jones Act would be stronger in this case if Sofianapoulos, Vlachos and Spyrakos were shareholders of Navigation. The fact that they are not shareholders, however, does not compel the conclusion that the Jones Act does *not* apply. As the Supreme Court noted in *Hellenic Lines, supra,* 398 U.S. at 308, 90 S.Ct. at 1733, the test for applicability of the Jones Act is not mechanical; no one

---

makes sense in the larger context of the testimony; it was proposed by plaintiff and not objected to by defendants.

**8.** This assertion by plaintiff is not completely supported by the evidence before the court. There is no evidence that in addition to importing goods to and exporting goods from the United States, the Enterprise did not carry goods from one Mediterranean port to another, thus earning some revenue not counted in United States-related trade. By the same token, there is also no evidence to lead the court to suspect that the Enterprise is so engaged, and defendants have not challenged plaintiff's assertion. At any rate, the court is satisfied that the Enterprise's revenue from cargo originating in or bound for the United States is substantial.

**9.** The name apparently derives from Lines' and Entemar's address in Piraeus—99 Akti Miaouli Street.

factor—including whether the alien defendant has an ownership interest in its American agent—should be considered talismanic. The question for the court is whether the foreign shipowner has such a strong presence in this country that withholding from it the obligations of the Jones Act would grant it an unfair competitive edge over domestic shipowners. It is possible for a foreign shipowner to have such a presence without owning stock in its agent in the United States.

Thus, in *Antypas*, the fact that the shareholders of the foreign shipowner also owned stock in the domestic agent was a factor in the court's decision to apply the Jones Act, but it was not the only factor. Other factors were that the vessel was operated from New York by a sub-agent who had been given "full and complete responsibility for the booking and solicitation of cargo and passengers and the collection of freight and passenger revenues for the account of [the shipping lines' vessels and] was given the power to fix rates, allocate tonnage and space sailings." *Antypas, supra,* 541 F.2d at 309. The court noted that the New York sub-agent also solicited business for the vessels by advertising in various journals. It also collected in New York the earnings from the vessel involved in the accident, and paid that vessel's expenses.

Similarly, the fact that the foreign shipowner in *Volyrakis* did not own the domestic agent was a factor in the Fifth Circuit's decision not to apply the Jones Act, but not the only factor. There, the court found that there was scant contact with this country by the vessel. It had visited the United States only three times since the defendant bought it. *Volyrakis, supra,* 668 F.2d at 864. Moreover, there was no evidence that the shipowner earned substantial income from United States trade, or that it was otherwise significantly involved in United States commerce. It was therefore not necessary to apply the Jones Act to insure competitive equilibrium between the defendants and domestic shipowners.

Even if some ownership interest in an American base of operations were crucial, Sofianapoulos, Vlachos and Spyrakos do have some ownership interest in the Charleston corporations, Trident, Wando and Romney. The fact that this interest is held through a separate corporation, Akti, is unimportant. In assessing Jones Act applicability, the court is instructed to look behind "the facade of the operation[.]" *Hellenic Lines, supra,* 398 U.S. at 310, 90 S.Ct. at 1734.

■ The court has taken a "cold objective look at the actual operational contacts that this ship and this owner have with the United States," *id.,* and concludes that defendants' contacts are substantial. *Cf. Mattes v. National Hellenic American Line, S.A.,* 427 F.Supp. 619 (S.D.N.Y.1977) (Lasker, J.). The Jones Act is applicable, to insure competitive equilibrium between foreign and domestic shipowners.

■ Defendants urge the court to dismiss the case nonetheless, under the doctrine of *forum non conveniens.* It is within the court's discretion to decline jurisdiction despite Jones Act applicability. *Cruz v. Maritime Company of Philippines,* 702 F.2d 47 (2d Cir.1983). Here, as with all *forum non conveniens* motions, the basic objective of the inquiry is to ensure that the situs of the trial is convenient. There is a strong presumption in favor of the plaintiff's choice of forum unless private and public interest considerations clearly point to trial in the alternate forum. *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508–09, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947); *Calavo Growers of California v. Generali Belgium,* 632 F.2d 963, 966–68 (2d Cir. 1980), *cert. denied,* 449 U.S. 1084, 101 S.Ct. 871, 66 L.Ed.2d 809, *reh. denied,* 451 U.S. 934, 101 S.Ct. 2012, 68 L.Ed.2d 321 (1981). In this case, the presumption favoring plaintiff's choice applies with less force than would ordinarily be the case since plaintiff is not a citizen of the chosen forum. *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 255–56, 102 S.Ct. 252, 265–66, 70

L.Ed.2d 419, *reh. denied*, 455 U.S. 928, 102 S.Ct. 1296, 71 L.Ed.2d 474 (1982). Nonetheless, the burden remains on the defendants to demonstrate why the presumption in favor of plaintiff's choice—a weakened presumption though it may be—should be disturbed. *See Ayers v. Arabian American Oil Co.*, 571 F.Supp. 707, 709 (S.D.N.Y. 1983) (Carter, J.) (foreign plaintiffs' choice of forum "is still entitled to some deference").

■ The private interests in this case do not point toward dismissal. The defense witnesses to the accident are Greek, but they are seamen under defendants' control, and they stop in United States ports at least as frequently as in Greek ones. Plaintiff's witnesses, on the other hand—his doctors and his expert investigator—are Americans, not subject to process in Greece. To the extent that documents will have to be produced at trial, the parties state that some documents are in Greece, some are aboard ship, and some are in the United States. This factor is therefore inconclusive. Defendants argue that time and money will have to be expended to translate testimony and documents from the Greek. This may be true, but it is not a hardship of sufficient magnitude to justify dismissal.

Nor do the public interests involved tip the scale in favor of dismissal. Though Greece has an interest in adjudicating a case involving Greek litigants aboard a Greek ship, *Doufexis v. Nagos S.S., Inc.*, 583 F.Supp. 1132 (S.D.N.Y.1983) (Werker, J.), the United States also has a strong interest in according equal treatment under the Jones Act to foreign and domestic shippers who compete in the American market. If this case were dismissed and adjudicated in Greece, Greek law, and not the Jones Act, would likely be applied. (Affidavit of defendant's expert, Evangelos Tsouroulis ¶ 5).

Defendant's motion to dismiss is denied.

IT IS SO ORDERED.