550 So.2d 59 (1989)
Francisco Sergio Quiroja ROJAS, Appellant,
v.
KLOSTER CRUISE, A/S, et al., Appellees.
No. 88-855.
District Court of Appeal of Florida, Third District.
September 5, 1989.
Rehearing Denied November 6, 1989.
*60 Brett Rivkind, Miami, for appellant.
Patton and Kanner and Michael F. Guilford, Miami, for appellees.
Before SCHWARTZ, C.J., and HUBBART and BASKIN, JJ.
SCHWARTZ, Chief Judge.
On November 8, 1986, Rojas, a Chilean national who was a member of the crew of the Norwegian flag vessel, M/S Southward, one of numerous cruise ships which operate year-round in the Caribbean area exclusively out of the Port of Miami, was injured aboard the vessel while it was docked in Nassau, Bahamas. After medical attention was administered in Miami, he sued the owner of the vessel, a Norwegian corporation, in the Dade County Circuit Court on claims of Jones Act negligence, 46 U.S.C.App. § 688 (1985), and under the general maritime law as applied in the United States for unseaworthiness and maintenance and cure. Apparently based upon the facts that neither the location of the accident, the nationality of the plaintiff, the flag, nor the purported allegiance of the corporate owner of the vessel was American, the trial judge dismissed the complaint "for lack of subject matter jurisdiction." Rojas appeals and we reverse upon the holding that, notwithstanding the factors which may militate against the applicability of American law,[1] the overwhelming *61 economic and commercial contacts between the vessel and its owner and the United States  including the facts that this country is the sole port of embarkation and disembarkation for all its business, the exclusive source of its income, and the location of the predominant, if not the only, base of its day-to-day operations  require the application of our law.[2]
*62 Our conclusion[3] is based upon the decision of the Supreme Court in Hellenic Lines Ltd. v. Rhoditis, 398 U.S. 306, 90 S.Ct. 1731, 26 L.Ed.2d 252 (1970). In Rhoditis, the court held that the traditional seven factors adopted in Lauritzen v. Larsen, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953) for determining whether a given shipowner is a Jones Act employer were neither exclusive nor decisive.[4] Instead, the court said, the issue must be considered "in light of the national interest served by the assertion of Jones Act jurisdiction." Rhoditis, 398 U.S. at 309, 90 S.Ct. at 1734, 26 L.Ed.2d at 256. In Rhoditis, that particular interest was to place a United States shipowner on the same competitive basis as an alien who was engaged in an extensive business operation in our country. Rhoditis squarely held, on that theory, that the fact that the Greek corporate owner maintained a base of operations, extensive business, and broad operational contacts with the United States, overcame, as a matter of law, the fact that the traditional factors otherwise weighed heavily against the assertion of the jurisdiction of our courts. The court said,
[t]he significance of one or more factors must be considered in light of the national interest served by the assertion of Jones Act jurisdiction. Moreover, the list of seven factors in Lauritzen was not intended as exhaustive. As held in Pavlou v. Ocean Traders Marine Corp., 211 F. Supp. 320, 325, and approved by the Court of Appeals in the present case, 412 F.2d 919 at 923 n. 7, the shipowner's base of operations is another factor of importance in determining whether the Jones Act is applicable; and there well may be others.
* * * * * *
Pericles [the primary stockholder of the Greek corporate shipowner] became a lawful permanent resident alien in 1952. We extend to such an alien the same constitutional protections of due process *63 that we accord citizens. Kwong Hai Chew v. Colding, 344 U.S. 590, 596, 73 S.Ct. 472, 477, 97 L.Ed. 576. The injury occurred here. The forum is a United States court. Pericles' base of operations is New York. The Hellenic Hero was not a casual visitor; rather, it and many of its sister ships were earning income from cargo originating or terminating here. We see no reason whatsoever to give the Jones Act a strained construction so that this alien owner, engaged in an extensive business operation in this country, may have an advantage over citizens engaged in the same business by allowing him to escape the obligations and responsibility of a Jones Act "employer." The flag, the nationality of the seaman, the fact that his employment contract was Greek, and that he might be compensated there are in the totality of the circumstances of this case minor weights in the scales compared with the substantial and continuing contacts that this alien owner has with this country. If, as stated in Bartholomew v. Universe Tankships Inc., 263 F.2d 437, the liberal purposes of the Jones Act are to be effectuated, the facade of the operation must be considered as minor, compared with the real nature of the operation and a cold objective look at the actual operational contacts that this ship and this owner have with the United States. By that test the Court of Appeals was clearly right in holding that petitioner Hellenic Lines was an "employer" under the Jones Act. (footnotes omitted) (emphasis original)
Rhoditis, 398 U.S. at 309-310, 90 S.Ct. at 1734-35, 26 L.Ed.2d at 256-57. We think that Rhoditis establishes the rule that the existence of substantial contacts including the existence of an extensive base of daily operations in the United States  even when they are less significant than those presented here  itself and alone requires the applicability of our law to the particular case. This is shown by a series of decisions which so hold, even after a mandated consideration of all the pertinent factors has yielded an overwhelming predomination to the contrary. Antypas v. CIA. Maritima San Basilio, S.A., 541 F.2d 307, 310 (2d Cir.1976) (per Clark, Associate Justice, "These contacts are substantial and predominate over such factors as the ship's flag, the place of incorporation of the shipowner, and the seaman's nationality. See Hellenic Lines Ltd. v. Rhoditis, 398 U.S. 306, 90 S.Ct. 1731, 26 L.Ed.2d 252 (1970); Pavlou v. Ocean Traders Marine Corp., 211 F. Supp. 320 (S.D.N.Y. 1962). We hold that the District Court clearly erred in finding the contacts to be insubstantial and in failing to apply the Jones Act."), cert. denied, 429 U.S. 1098, 97 S.Ct. 1116, 51 L.Ed.2d 545 (1977); Moncada v. Lemuria Shipping Corp., 491 F.2d 470, 473 (2d Cir.1974) ("[A]ll defendants have their base of operations in this country and the managing and the chartering of the vessel were conducted from this country... . [W]e hold that the contacts between this transaction and the United States are substantial and that Jones Act jurisdiction exists."), cert. denied, 417 U.S. 947, 94 S.Ct. 3072, 41 L.Ed.2d 667 (1974); Karvelis v. Constellation Line S.A., 608 F. Supp. 966, 971 (S.D.N.Y. 1985) ("The court has taken a `cold objective look at the actual operational contacts that this ship and this owner have with the United States,' id., and concludes that defendants' contacts are substantial. Cf. Mattes v. National Hellenic American Line, S.A., 427 F. Supp. 619 (S.D.N.Y. 1977)... . The Jones Act is applicable to insure competitive equilibrium between foreign and domestic shipowners."), aff'd, 806 F.2d 49 (2d Cir.1986), cert. denied, 481 U.S. 1015, 107 S.Ct. 1891, 95 L.Ed.2d 498 (1987); Rivera v. Offshore Crews, Inc., 595 F. Supp. 628, 630 (E.D.La. 1984) ("The substantial and continuing contacts set out herein indicate the base of operations was in the United States, and outweighs any interest which might be served by litigating this case in Mexican courts."); Mattes v. National Hellenic American Line, S.A., 427 F. Supp. 619, 626 (S.D.N.Y. 1977) ("[S]ubstantial aspects of its operation, management and marketing are directed by American corporations... . [W]e find that the defendants have sufficiently substantial contacts with the United States ... to warrant application of the Jones Act."); *64 Mihalopoulos v. Westwind Africa Line, Ltd., 511 So.2d 771, 777 (La. App. 1987) ("Westwind had obvious, substantial, and continuous connections with the United States. We agree with plaintiff that a base of operations need not be the `principal' base in order to justify imposition of United States substantive law under the cited jurisprudence. In determining the import of the `base of operations' factor, the analysis is one of `extensive business operations.'"); see Fisher v. Agios Nicolaos V, 628 F.2d 308 (5th Cir.1980) ("vessel's entire service under its present ownership, and its entire revenues therefore to be earned, arose from a base of operations in the United States"), cert. denied, 454 U.S. 816, 102 S.Ct. 92, 70 L.Ed.2d 84 (1981); see also Bailey v. Dolphin Intern'l, Inc., 697 F.2d 1268, 1275 n. 22 (5th Cir.1983) (American law not applied even if all other factors so indicated because day-to-day operational decisions were made in Singapore and Indonesia). Indeed, no case involving a seagoing vessel[5] has been cited in which a substantial contact or base of operations[6] exists and American jurisdiction has nonetheless been denied. We will not be the first to so hold.
These cases, in which the extent of American contacts and the importance of the United States as the location from which the operations of the vessel are controlled are almost uniformly less than those presented here, therefore necessarily apply to the present defendant on an a fortiori basis. Indeed, it would be hard to imagine a commercial situation in which American interests, to the virtual exclusion of any others, so completely control both the daily commercial operations and the long-term prosperity of the defendant and its vessels. The commercial fortuities that the vessel flies a foreign flag and is owned by a corporation and principals domiciled abroad should make no difference in the determination of their potential liability under our law. Reverting to Rhoditis, the operation of the defendant's liner is economically indistinguishable from that of a hypothetical United States flag vessel owned by United States interests. Compare Sigalas v. Lido Maritime Inc., 776 F.2d 1512 (11th Cir.1985) with Kukias v. Chandris Lines, Inc., 839 F.2d 860 (1st Cir.1988). Since the defendant takes this economic advantage and benefit from its presence in the United States and the protection of our laws, it must also bear the burdens and obligations imposed by them. The final upshot is that the realities of the situation require the finding that the appellee is a Jones Act "employer" and is subject to American law and jurisdiction.[7] We therefore reverse the *65 order of dismissal with directions for further proceedings consistent herewith after remand.
Reversed.
NOTES
[1] The appellees' brief accurately marshals the case in favor of the conclusion below that American law does not apply:

ROJAS was injured while serving aboard the ship M/S SOUTHWARD ("SOUTHWARD") on November 8, 1986, in Nassau, Bahamas. At the time ROJAS was injured, KLOSTER CRUISE A/S, a Norwegian corporation, owned and operated the SOUTHWARD. The SOUTHWARD flew the Norwegian flag. She was registered in Norway and her home port was Oslo, Norway.
ROJAS is a citizen of and domiciled in Chile. He served aboard the SOUTHWARD pursuant to an Employment Contract with KLOSTER CRUISE A/S entered into at Santiago, Chile. The Employment Contract provided that the Norwegian Seamen's Act governed the parties' relationship. The Norwegian Seamen's Act mandates that all lawsuits against KLOSTER CRUISE A/S for occupational injuries must be brought before a court of justice in Norway.
ROJAS' status was that of a Norwegian Seaman. He was a member of the Norwegian Seaman's Union. Additionally, he paid taxes to Norway and received his salary in Norwegian Krone. Since his injury, ROJAS has received benefits under the Norwegian Seamen's Act from the Norwegian Social Security System for Foreign Affairs.
The cruise operations of KLOSTER CRUISE A/S had their origin as a division of Klosters Rederi A/S, a privately-owned Norwegian company. Klosters Rederi A/S first engaged in the business of operating cargo ships in 1924. In 1966, Klosters Rederi A/S formed a cruise ship division operating under the name Norwegian Caribbean Lines ("NCL").
In 1984, Klosters Rederi A/S transferred the operations of NCL to Norwegian Caribbean Lines A/S, a Norwegian corporation with the same ownership as Klosters Rederi A/S. Norwegian Caribbean Lines A/S acquired another division, Royal Viking Line, in July, 1984. To eliminate any confusion caused by the corporation's name, Norwegian Caribbean Lines A/S changed its name to KLOSTER CRUISE A/S. Although the name changed, the Norwegian ownership and control of the Corporation remained the same.
The corporate headquarters of KLOSTER CRUISE A/S was in Oslo, Norway at the time of Rojas' accident. Of the two cruise divisions, only the NCL division had a base of operations in the United States. This was located in Miami. The SOUTHWARD served the NCL division and was built in 1971 by Klosters Rederi A/S.
In November, 1986, all corporate decisions were made from Oslo, Norway. In addition, all operational decisions relating to the Company and its divisions were made in Oslo. These operational decisions included matters involving the hotel, personnel, deck and engine crew, and technical operations of the Corporation and the NCL division.
KLOSTER CRUISE A/S is a publicly owned Norwegian corporation whose shares of stock were 95% owned by citizens and residents of Norway. U.S. stock ownership in KLOSTER CRUISE A/S was less than 5%. The KLOSTER CRUISE A/S ships were entirely financed through a consortium of European Banks. All the shareholders meetings of the Corporation were held in Norway. The majority of the Board of Directors Meetings were also held in Norway. All income generated by the NCL division, except the funds necessary for the operation, was repatriated to Norway.
[2] We believe that the facts concerning the contacts with and operations of the defendant in the United States are fairly summarized in the appellant's brief.

At the time Plaintiff was injured, the M/S SOUTHWARD, was owned and operated by KLOSTER CRUISES, A/S. KLOSTER CRUISES, A/S was a Norwegian corporation, with its principal place of business in Miami, Florida. It is partly owned by U.S. citizens. It is authorized to do business in the State of Florida.
* * * * * *
As to the Defendants' cruise ship operations, which accounted for all of its revenues (in excess of $300,000,000.00 in 1986), the following operational aspects were all present in the United States, principally in Miami, Florida:
a. NCL, is based in Miami, Florida, with offices at One Biscayne Tower. (In 1986, it subsequently moved to Coral Gables.)... .
b. The president of NCL, Rod McLeod, in 1986 and Ronald Zeller, as his successor, maintain their offices and residences in Miami, Florida. (Both are United States citizens.)
c. The home port of the NCL vessels is Miami, Florida where passengers board for their cruises and disembark at the completion of the cruises.
d. Einar Kloster, chief executive officer, and Chairman of the Board, (a member of the Kloster family) maintains an office in Miami, Florida and has a residence in Miami, Florida.
e. The passenger relations department for the NCL operation is located in Miami, Florida, headed by Anita Davis, the director of Customer Relations. She handles all the passenger complaints out of her Miami office, and maintains the records and files on such matters in her Miami office.
f. The actual operations department, headed by Sven Dahl, is located at the Port of Miami.
g. The Hotel Department operations, which is the largest department aboard the vessels, is headed by Anderson Perry at One Biscayne Tower.
h. The sales department, where all of the tickets for the vessels are actually issued is in Miami, Florida. The revenues of the cruises are then collected and placed into a bank account in Miami, Florida. There is no other source of revenue than income from operation of the ships.
i. The Human Resources and Administrative Services Department, which is responsible for the management of the shoreside personnel for NCL (approximately 400 employees) is in Miami.
j. A separate department exists at the Port of Miami to handle the crewmembers aboard the vessels.
k. NCL has five ships out of the Port of Miami, which hold approximately 4,664 passengers, which all embark and disembark at the Port of Miami.
l. NCL hires or leases buses to transport passengers from the Miami airport to its vessels.
m. NCL has approximately 153,100 square feet of warehouse space in Miami, Florida to store its inventories, parts and supplies for the vessels.
n. NCL has between 30,000 and 50,000 square feet of office space in Miami, Florida and another approximately 30,000 square feet in San Francisco, California, compared to approximately 6,000 square feet of office space in Norway.
o. The vessels are supplied (food, fuel, provisions, etc.) in Miami, Florida.
p. The major repairs for the vessels (dry docking of the vessels) are performed at Jacksonville, Florida.
q. All the major equipment used to communicate with the vessels, such as radio communications, telexes, etc. are in Miami, Florida.
r. The crews are paid from funds from a Miami bank account.
s. The maintenance records of the vessels are kept onboard the ships.
t. All advertising and marketing originate from the marketing department in Miami, Florida.
u. All of the offices of NCL are in Miami.
v. Corporate counsel for NCL is in Miami, Florida, the Law Firm of Patton and Kanner.
w. The comptroller of Defendant, Lamar Cooler, responsible for the accounting function of the operation is based in Miami.
x. NCL ships accounted for approximately 38.1% of the total passenger boardings at the Port of Miami for 7 day cruises, and 21.1% of the total boardings for 3 and 4 day cruises.
y. NCL is frequently involved in litigation in Dade County, Florida.
z. Defendant provides maintenance and cure to its seamen in Miami and maintains a Medical Department in Miami, which handles pre-employment physicals and coordination of medical treatment for crewmembers. (Plaintiff was flown here for treatment. One of Plaintiff's counts in his Complaint is for breach of Defendant's obligation to provide maintenance and cure. Thus, Plaintiff's cause of action for maintenance and cure arose in Miami, Florida).
[3] Like Judge Carter in Karvelis v. Constellation Lines SA, 608 F. Supp. 966, 968 n. 2 (S.D.N.Y. 1985), aff'd, 806 F.2d 49 (2d Cir.1986), cert. denied, 481 U.S. 1015, 107 S.Ct. 1891, 95 L.Ed.2d 498 (1987), we find it unnecessary to opine whether the issue is properly considered, as below, as a matter of subject matter jurisdiction, or as one which goes to the alleged failure of the plaintiff to state a cause of action under the law of the United States rather than Norway, as indicated in the plaintiff's contract of employment. Either approach yields the same result.
[4] Those factors were stated as follows:

(1) the place of the wrongful act; (2) the law of the flag; (3) the allegiance or domicile of the injured seaman; (4) allegiance of the defendant shipowner; (5) the place where the contract of employment was made; (6) the inaccessibility of a foreign forum; and (7) the law of the forum.
Rhoditis, 398 U.S. at 308, 90 S.Ct. at 1733, 26 L.Ed.2d at 255. In this case, it may be said that only the "law of the forum," a very insubstantial factor, favors American law with the accessibility of the Norweigan forum in some doubt. In Rhoditis itself, however, the only additional element  since the nationality of the plaintiff, the vessel, and the defendant owner were all Greek  was that the accident itself occurred in the United States. It is well recognized, however, that, in dealing with a "blue water" vessel like the Southward, the place of the accident is purely fortuitous and thus wholly insignificant for these purposes. Kukias v. Chandris Lines, Inc., 839 F.2d 860, 862 (1st Cir.1988); Villar v. Crowley Maritime Corp., 782 F.2d 1478, 1480 (9th Cir.1986); Karvelis, 608 F. Supp. at 969; Pandazopoulos v. Universal Cruise Line, Inc., 365 F. Supp. 208, 210 (S.D.N.Y. 1973). Even as to this point, it is of some importance that the complaint alleges that maintenance and cure were insufficiently or improperly provided in Miami. See Koke v. Phillips Petroleum Co., 730 F.2d 211, 220 (5th Cir.1984); Rivera v. Offshore Crews, Inc., 595 F. Supp. 628, 629 n. 3 (E.D.La. 1984).
[5] The distinction drawn by the cases as to the importance of the "base of operations" factor between vessels like the M/S Southward and special purpose structures such as a submersible drilling rig, see Bailey, 697 F.2d at 1274-75; Chiazor v. Transworld Drilling Co., 648 F.2d 1015 (5th Cir.1981), cert. denied, 455 U.S. 1019, 102 S.Ct. 1714, 72 L.Ed.2d 136 (1982); Rivera, 595 F. Supp. at 628, only goes to prove the validity of the principle we apply here. This is because, following the Rhoditis rationale, the area of competition involved between drilling rigs obviously is located at the point of the rigs themselves, regardless of the area from which those operations may be controlled; the opposite is true, as Rhoditis itself reflects, in the case of seagoing vessels.
[6] The base of operations referred to for the purposes of this analysis does not concern the location of corporate or policy decision-making such as may have taken place in Norway as to the Southward and its sister vessels, see supra note 1. Rather it is the base from which the vessel is controlled on a day-to-day basis, here, Miami, which is important for choice of law purposes. Nicol v. Gulf Fleet Supply Vessels, Inc., 743 F.2d 289, 297 (5th Cir.1984); Koke, 730 F.2d at 220; Bailey, 697 F.2d at 1275 n. 22; see Chiazor, 648 F.2d at 1015; Phillips v. Amoco Trinidad Oil Co., 632 F.2d 82 (9th Cir.1980), cert. denied, 451 U.S. 920, 101 S.Ct. 1999, 68 L.Ed.2d 312 (1981).
[7] We reject the appellees' contention that Valverde v. Klosters Rederi A/S, 294 So.2d 101 (Fla. 3d DCA 1974) requires a contrary holding. While the case apparently involved a similar factual situation, and a predecessor of the same corporate defendant, Valverde makes no reference to the United States contacts-base of operations criteria which are decisive here; indeed, the Rhoditis case, which controls, is not even cited. Valverde can therefore hardly be determinative of the present result.

Moreover, even had the Rhoditis issue been considered, any finding of its inapplicability in 1970 would not control the resolution of the same question based on the factual situation in 1986. This conclusion is aptly demonstrated by Dracos v. Hellenic Lines, Ltd., 762 F.2d 348 (4th Cir.1985), cert. denied, 474 U.S. 945, 106 S.Ct. 311, 88 L.Ed.2d 288 (1985), in which the court held that the Rhoditis holding that the shipowner was subject to American jurisdiction did not, under principles either of stare decisis or the expansive Federal version of collateral estoppel, require the same conclusion as to the very same defendant, Hellenic Lines, Inc., in a case arising more than a decade later. The same applies in reverse here.